RASHARD CHARLES CONNER,

       Plaintiff,

    v.

MARTY ALLEN; ROBERT TOOLE; SGT.
NORRIS HERNDON; JOSEPH
HUTCHESON; and VALARIE JACKSON,

       Defendants.

CIVIL ACTION NO.: 6:17-cv-10

## ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion to Dismiss. Doc. 21. For the reasons below, I **RECOMMEND** the Court **GRANT** Defendants' Motion, **DISMISS without prejudice** Plaintiff's excessive force, failure to intervene, and retaliation claims for failure to exhaust administrative remedies, and **DISMISS with prejudice** Plaintiff's procedural due process claims for failure to state a claim. I also **RECOMMEND** the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal and **DENY** Plaintiff *in forma pauperis* status on appeal.

## BACKGROUND

On January 11, 2017, Plaintiff, while incarcerated at Georgia State Prison ("GSP") in Reidsville, Georgia, brought this action under 42 U.S.C. § 1983 to challenge certain conditions of his confinement. Doc. 8. Plaintiff alleges he was attacked by another inmate on September 30, 2016, and Defendant Herndon, instead of protecting him, sprayed him in the face with pepper spray and temporarily blinded him. Id. at 6. As a result of the fight, the prison issued a disciplinary report against Plaintiff and, at some point in October or November 2016, placed Plaintiff in the Tier II program, a form of administrative segregation. Id. at 6–7; Doc. 32 at 4–5.

Plaintiff asserts he did not instigate the fight or defend himself against the other inmate and that the disciplinary report issued against him was expunged on appeal. Doc. 8 at 8; Doc. 24-6 at 2; Doc. 32 at 2. However, Plaintiff alleges Defendants Jackson and Hutcheson did not move Plaintiff back to general population, even after the disciplinary report was expunged. Doc. 32 at 7. According to Plaintiff, these Defendants placed Plaintiff in administrative segregation and ensured he remained there to silence him. Doc. 8 at 6.

After the Court conducted a frivolity review, the following claims remained pending: (1) Plaintiff's Eighth Amendment excessive force claim against Defendant Herndon; (2) Plaintiff's Eighth Amendment failure to intervene claim against Defendant Herndon; (3) Plaintiff's First Amendment retaliation claims against Defendants Jackson, Hutcheson, Allen, and Toole; and (4) Plaintiff's Fourteenth Amendment procedural due process claims against Defendants Jackson, Hutcheson, Allen, and Toole.[1] Doc. 9 at 12; Doc. 20.

On July 30, 2018, Defendants filed a Motion to Dismiss. Doc. 21. In their supporting brief, doc. 21-1, Defendants argue Plaintiff failed to properly exhaust all available administrative remedies, as set out in the Georgia Department of Corrections' ("GDC") grievance policy. Doc. 21-1 at 3–7. Additionally, Defendants assert that all four of Plaintiff's claims fail due to failure to state a claim upon which relief can be granted. Id. at 8–20. Third, Defendants aver that all of Plaintiff's claims are barred by qualified immunity. Id. at 20–22. Finally, and alternatively, Defendants argue Plaintiff is limited to only nominal damages. Id. at 23–24. Defendants provide seven supporting exhibits: (1) an affidavit from Jeff Sikes, the grievance coordinator at GSP, doc. 21-2; (2) Standard Operating Procedure ("SOP") IIB05-0001, detailing the GDC's policy for general grievances, doc. 21-3; (3) SOP IIB09-0003, detailing the GDC's

---

[1]      The Court dismissed Plaintiff's claims against Defendants in their official capacities; the remaining claims are against Defendants in their individual capacities. Doc. 9 at 5, 12; Doc. 20.

policy for Tier II administrative segregation placements, reviews, and appeals, doc. 21-4; (4) a

copy of Plaintiff's assigned location and movements while incarcerated, doc. 21-5; (5) a copy of

Plaintiff's grievance and disciplinary history, doc. 21-6; (6) a copy of Grievance Number

232489, doc. 21-7; and (7) a copy of Grievance Number 234467, doc. 21-8.

Plaintiff opposes the Motion to Dismiss.[2]  Docs. 24, 27, 32.  In support, Plaintiff attaches

several exhibits, including receipts for various grievances, copies of grievance forms and

appeals, and other related documents.[3]  Docs. 24-1 to 24-6.

## DISCUSSION

I. **Whether Plaintiff Exhausted his Administrative Remedies**

   A. **Legal Requirements for Exhaustion**

Under the Prison Litigation Reform Act ("PLRA"), an incarcerated individual must

properly exhaust all available administrative remedies—the prison's internal grievance

procedures—before filing a federal lawsuit to challenge prison conditions.  42 U.S.C.

§ 1997e(c)(1); see Jones v. Bock, 549 U.S. 199, 202 (2007); Harris v. Garner, 216 F.3d 970, 974

---

[2]     Plaintiff responded in opposition to Defendants' Motion to Dismiss with two briefs captioned "objections."  Docs. 24, 32.  Defendants submitted a reply brief in support of their Motion to Dismiss. Doc. 28.  The Court has considered all briefs submitted by the parties.

[3]     Additionally, Plaintiff alleges, for the first time, that he was also denied due process when, after completing the final phase of the Tier II program in August 2017, Defendant Hutcheson and others did not perform a 90-day review as required by SOP IIB09-0003, forcing Plaintiff to restart the program at the beginning and thus prolonging his time in administrative segregation, in violation of his procedural due process rights.  Doc. 24 at 3–4; Doc. 32 at 7–9.  However, the proper procedure for asserting a new or additional claim is by seeking leave to amend or filing a new action; claims raised for the first time in an opposition brief are not properly before the Court.  See, e.g., Levine v. EverBank, FSB, No. 117CV00826SCJCMS, 2017 WL 6994578, at *13 (N.D. Ga. Nov. 2, 2017), *report and recommendation adopted*, No. 1:17-CV-826-SCJ, 2017 WL 6994588 (N.D. Ga. Nov. 20, 2017).  Although pro se pleadings are held to a less stringent standard and are construed liberally, pro se parties are not excused from compliance with procedural rules.  Moton v. Cowart, 631 F.3d 1337, 1341 n.2 (11th Cir. 2011); Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007).  This Court, therefore, will not consider Plaintiff's new allegations, improperly asserted for the first time in Plaintiff's responsive briefing.  The Court does, however, consider all factual allegations made by Plaintiff in his responsive pleadings that relate to his currently existing claims.

(11th Cir. 2000). The purpose of the PLRA's exhaustion requirement is to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Whatley v. Warden, Ware State Prison (Whatley I), 802 F.3d 1205, 1208 (11th Cir. 2015) (quoting Woodford v. Ngo, 548 U.S. 81, 93 (2006)). Exhaustion is a mandatory requirement, and courts have no discretion to waive it or excuse it based on improper or imperfect attempts to exhaust, no matter how sympathetic the case or how special the circumstances. Ross v. Blake, 136 S. Ct. 1850, 1857 (2016) (finding that the PLRA requires exhaustion "irrespective of any 'special circumstances'" and its "mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account"); Jones, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). Moreover, courts may not consider the adequacy or futility of the administrative remedies afforded to the inmate. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000). Rather, courts may only determine whether administrative remedies are available and whether the inmate properly exhausted these remedies prior to filing suit. Id.

Exhaustion must be proper, and proper exhaustion requires compliance with the prison's administrative policies, deadlines, and other critical procedural rules. Woodford, 548 U.S. at 91–92; Bryant v. Rich, 530 F.3d 1368, 1378 (11th Cir. 2008) ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'" (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005))). The prison's administrative grievance policies delineate what procedural steps prisoners must follow to fully exhaust. Jones, 549 U.S. at 218; Bracero v. Sec'y, Fla. Dep't of Corr., No. 17-14278, 2018 WL 3861351, at *1 (11th Cir. Aug. 14, 2018) ("To satisfy the exhaustion requirement, a prisoner must complete the administrative process in accordance with the applicable grievance procedures

established by the prison."). Proper exhaustion requires prisoners do more than simply initiate a grievance; they must correctly follow all procedural rules set out in the institution's policy— including time limits—and must appeal any denial of relief through all levels of review that comprise the agency's administrative grievance process. Johnson, 418 F.3d at 1159 ("Prisoners must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures before filing a federal claim."); Sewell v. Ramsey, No. 4:06-cv-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies); see also Porter v. Sightler, 457 F. App'x 880, 882 (11th Cir. 2012) (affirming dismissal based on lack of exhaustion when plaintiff-inmate failed to file a grievance within 10 days of the incident as required by GDC policy).

### B.    Standard of Review for Exhaustion

Failure to exhaust administrative remedies is an affirmative defense, and inmates are not required to specially plead or demonstrate exhaustion in their complaint. Jones, 549 U.S. at 216; Pearson v. Taylor, 665 F. App'x 858, 867 (11th Cir. 2016); Whatley I, 802 F.3d at 1209. "In response to a prisoner lawsuit, defendants may file a motion to dismiss and raise as a defense the prisoner's failure to exhaust administrative remedies." Pearson, 665 F. App'x at 867. Additionally, "[w]hen ruling on a motion to dismiss for failure to exhaust administrative remedies, the court may consider evidence outside the pleadings." White v. Berger, 709 F. App'x 532, 541 n.4 (11th Cir. 2017) (citing Bryant, 530 F.3d at 1376); Glenn v. Smith, 706 F. App'x 561, 563–64 (11th Cir. 2017); Singleton v. Dep't of Corr., 323 F. App'x 783, 785 (11th Cir. 2009) ("A district court may properly consider facts outside of the pleadings to resolve a factual dispute regarding exhaustion where the factual dispute does not decide the merits and the parties have a sufficient opportunity to develop the record." (citing Bryant, 530 F.3d at 1376)).

In <u>Turner v. Burnside</u>, the Eleventh Circuit Court of Appeals laid out a two-part test for resolving motions to dismiss for failure to exhaust administrative remedies under § 1997e(a). 541 F.3d 1077, 1080–82 (11th Cir. 2008). First, courts "look[] to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, take[] the plaintiff's version of the facts as true." <u>Id.</u>; <u>see also</u> <u>Bracero</u>, 2018 WL 3861351, at *1. This prong of the <u>Turner</u> test ensures there is a genuine dispute of material fact regarding the inmate-plaintiff's failure to exhaust. <u>Glenn</u>, 706 F. App'x at 563–64 (citing <u>Turner</u>, 541 F.3d at 1082); <u>Pavao v. Sims</u>, 679 F. App'x 819, 824 (11th Cir. 2017). "The court should dismiss [the action] if the facts as stated by the prisoner show a failure to exhaust." <u>Abram v. Leu</u>, No. 17-12319, 2019 WL 76849, at *2 (11th Cir. Jan. 2, 2019) (quoting <u>Whatley I</u>, 802 F.3d at 1209); <u>Turner</u>, 541 F.3d at 1082 ("This process is analogous to judgment on the pleadings under Federal Rule of Civil Procedure 12(c).").

"If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." <u>Turner</u>, 541 F.3d at 1082; <u>see also</u> <u>Glenn</u>, 706 F. App'x at 563–64; <u>Pearson</u>, 665 F. App'x at 867 ("At the second step, the court [is] permitted to make factual findings to resolve the issue of exhaustion."). After resolving the factual disputes, the court then decides whether, "based on those findings, defendants have shown a failure to exhaust." <u>Bracero</u>, 2018 WL 3861351, at *1 (quoting <u>Whatley I</u>, 802 F.3d at 1209).

### C. GDC's Administrative Grievance Policies

The GDC's general grievance policies are set out in Standard Operating Procedure ("SOP") IIB05-0001. <u>Whatley I</u>, 802 F.3d at 1208. SOP IIB05-0001 contains the policy for general grievances, including grievances for excessive force and retaliation. <u>See</u> <u>Whatley v.</u>

Smith (Whatley II), 898 F.3d 1072, 1074 (11th Cir. 2018) ("To exhaust administrative remedies under the Georgia Department of Corrections Standard Operating Procedures ("SOP"), inmates must follow the . . . prison grievance process outlined in SOP IIB05-0001."). Under SOP IIB05-0001, inmates may "file a grievance about any condition, policy, procedure, or action or lack thereof" which "affects the offender personally" and which is not explicitly listed in the SOP as a "non-grievable issue." Doc. 21-3 at 7. Under SOP IIB05-0001, inmates cannot file grievances about "[i]nvoluntary assignments to administrative segregation."[4] Id. Rather, SOP IIB09-0003 outlines the procedure by which inmates may contest placement in Tier II administrative segregation. Doc. 21-4.

### 1.    SOP IIB05-0001

Under SOP IIB05-0001, inmates must file grievances within 10 days of becoming aware of the facts from which the grievance arises. Whatley II, 898 F.3d at 1075; Shaw v. Toole, No. 6:14-CV-48, 2015 WL 4529817, at *5 (S.D. Ga. July 27, 2015). The grievance is screened by a Grievance Counselor, who determines whether to accept the grievance for processing. Shaw, 2015 WL 4529817, at *5. Inmates may "hand deliver" a completed grievance form to any counselor, who provides the offender with a receipt. Doc. 21-3 at 9. If the grievance is accepted for processing, the warden has 40 days to review the grievance and determine whether to grant or deny it. Shaw, 2015 WL 4529817, at *5. If a grievance goes unanswered, the inmate may appeal the non-response after the warden's time to answer expires. Id. ("An inmate can file an appeal with the Commissioner's Office in the following instances: if the grievance coordinator rejects his original grievance; after the warden responds to the original grievance; or when the

---

[4]     However, offenders may still file grievances "alleging retaliation or harassment" under SOP IIB05-0001, even if the alleged retaliation or harassment relates to a disciplinary action, housing or program assignment, or transfer between institutions. Id. at 8.

time allowed for the warden's decision has expired."); see also, Whatley I, 802 F.3d at 1208 ("If the warden does not respond within forty days . . . the prisoner may appeal[.]").

### 2.    SOP IIB09-0003

The Tier II program is a "comprehensive facility-wide [s]egregation stratification plan that manages the institutional conduct and programmatic need of offenders assigned to the program." Doc. 21-4 at 1. The Tier II program was established "to protect staff, offenders, and the public from offenders[] who commit or lead others to commit violent, disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to the safety and security of the institutional operation." Id. The program operates as "an offender management process . . . not a punishment measure" and creates "an incentive program-based level of privileges" based on "offender behavior and program compliance." Id. at 4–5. The program consists of three phases which the offender may progress through "based upon the offender meeting or failing to meet the goals outlined in the offender's individualized case plan." Id.

### (a)    Initial Assignment Appeals Procedure

When an inmate is recommended for the Tier II program, the Classification Committee reviews the recommendation, determines eligibility, and submits its own recommendation to the warden, who must deny or approve the request within seven days. Id. at 5–6. Once the inmate is assigned to the Tier II program, the Classification Committee holds an administrative segregation hearing within 96 hours of the assignment. Id. at 6. The warden can also "authorize the immediate assignment of an offender to the Tier II program" in emergency situations. Id. at 7. Once the warden approves the inmate's assignment in the Tier II program, the inmate will receive a Tier II Program Assignment Memo detailing the reasons for assignment. Id. at 7, 20. Inmates may appeal their initial assignment by submitting a completed Tier II Program Assignment Appeal Form within three business days of receipt of the Memo. Id. at 7, 19–20.

Offenders must submit their appeals form to their "assigned counselor for processing by the Tier II Program Unit Manager's office." Id. at 7. The Director of Field Operations will then review the appeal and send the "final decision" to the warden within 14 business days. Id. SOP IIB09-0003 contains no mechanism for appealing a final decision from the Director of Field Operations. Id.

### (b)    The 90-Day Review Appeals Procedure

After an inmate has been in the Tier II program for 90 days, he will have an in-person meeting with the Classification Committee, which is a "culmination of the previous informal . . . contacts that have been completed as part of the routine case management practices." Id. at p. 9–10. At this meeting, the Classification Committee review the counselor's recommendation to determine whether the inmate will: (1) transition from one phase to the next phase; (2) remain in the current phase or reassigned to a previous phase until the next 90 day review; (3) be assigned to the Tier I segregation program or general population upon completion of the Tier II program; or (4) be reassigned to the current phase at another facility or in GDC's high max unit. Id. In making its recommendation, the Classification Committee provides specific reasons for its recommendation and will consider the inmate's: length of time in the current phase; continued facility risk; number, type, and frequency of disciplinary reports; progress in the Tier II program; and demeanor with staff in the Tier II living areas and during periodic reviews. Id. Once the warden or designee approves the Classification Committee's recommendation, the inmate will be served with a copy of the action in the form of a Tier II Program 90-Day Review Memo. Id. at 10–11, 19–20. Inmates who remain on the Tier II Program after their initial 90-day review will receive another review every 90 days. Id. at 10–11.

As with the initial placement in the Tier II program, the inmate may appeal the 90-day review with the warden within three business days of receipt of the notice, after which the

warden or designee has seven days to respond.  Id.  The only substantive difference between the appeals process for the initial Tier II program assignment and the 90-day review is that for the 90-day review, the inmate must appeal using the Tier II Program 90-Day Review Assignment Appeal Form.  Id. at 6–7; 10-11; 19-20.  Like Tier II assignment appeals, the 90-day review appeals process contains only one level of review, and there is no procedure for contesting or appealing the warden's decision.  Id. at 10–11.

### D. Analysis of Plaintiff's Efforts at Exhaustion

#### 1. Excessive Force and Failure to Intervene Claims

Plaintiff's excessive force and failure to intervene claims relate to the September 30, 2016 incident where Plaintiff alleges Defendant Herndon violated his constitutional rights by pepper spraying Plaintiff and failing to defend him from an attack by another inmate.  Doc. 8 at 5–6, 9.  Under SOP IIB05-0001, Plaintiff was thus required to file his grievance against Defendant Herndon for excessive force and failure to intervene by October 10, 2016 (10 days from the alleged incident).[5]  Evidence submitted by Defendants, however, shows Plaintiff only filed one grievance in all of 2016, and that grievance was filed on November 30, 2016, and does not pertain to Plaintiff's claims in this action.  Doc. 21-2 at 7; Doc. 21-6 at 2; Doc. 21-7 at 4; Doc. 24-6 at 3–4.

Plaintiff seemingly concedes that he did not file a timely grievance.  However, Plaintiff, in his second Response to Defendants' Motion, claims that he could not do so because prison officers failed to provide him with grievance forms and that he was unable to receive a grievance

---

[5]      Though Plaintiff successfully appealed a disciplinary report filed against him, doc. 24-6 at 2, he was also required to use the prison's general grievance procedures to grieve the September 30, 2016 actions from which his excessive force and failure to intervene claims arise.

form until another inmate gave him one on October 25, 2016.[6]  Doc. 32 at 2.  Taking Plaintiff's

allegations as true, Plaintiff would still be required to file an out-of-time grievance once the

forms were available to him.  See Bryant, 530 F.3d at 1379 (finding a plaintiff failed to exhaust

all administrative remedies when grievance procedures were temporarily unavailable but the

plaintiff failed to file an out-of-time grievance once the grievance process became available).

Plaintiff claims that he did, in fact, file an out-of-time grievance on October 25 or 27,

2016, about Defendant Herndon's excessive use of force and failure to intervene, but this

grievance was never processed.  Doc. 24 at 1–2; Doc. 32 at 3–4.  He alleges he submitted the

grievance through "in house mail" but never received a receipt.  Doc. 24 at 1; Doc. 32 at 2.

Nevertheless, Plaintiff retained a personal copy of the grievance form, which he submitted to the

Court.  Doc. 24-6 at 10.  Defendants dispute whether Plaintiff ever filed this grievance.  Doc. 21-

1 at 6–7; Doc. 28 at 2.

Nothing in these facts require the Court to move to the second step of the Turner test.

Accepting all of Plaintiff's allegations as true, the facts still show Plaintiff failed to exhaust,

because he never appealed the lack of response to his untimely excessive force grievance.  GDC

policy provides an appeals procedure by which inmates can appeal an unanswered grievance

once the time allowed for response expires.  Thus, inmates are required to utilize that appeals

process to properly exhaust.  Whatley II, 898 F.3d at 1074 ("The 'prison grievance system'

includes all levels of administrative review." (emphasis in original)); Turner, 541 F.3d at 1084

(noting that the GDC's "SOP require[s] inmates to appeal within five days after they have

---

[6]     Plaintiff alleges that "officers in the building [where he was housed] stated that they had no
grievance forms at all."  Doc. 32 at 2.  As Plaintiff does not allege that prison officials denied him the
forms, just that he was told such forms were not available, it is not entirely clear that his allegation, taken
as true, renders the grievance procedure unavailable.  Plaintiff also does not allege he attempted to submit
his grievance orally.  Regardless, out of an abundance of caution, the Court will assume Plaintiff is
alleging unavailability.

received either an unfavorable written response to their formal grievance or no written response at all within the time provided for one"); Malcolm v. Doe, No. 6:18-CV-24, 2018 WL 2108108, at *3–4 (S.D. Ga. Mar. 19, 2018) (dismissing a complaint for failure to exhaust administrative remedies when prison officials never responded to the grievance and the plaintiff failed to appeal the responded-to grievance after the time to respond passed).

As Plaintiff does not assert that he appealed after receiving no response, there is no material dispute about facts on this issue for the Court to resolve. Rather, because the facts Plaintiff alleges show lack of proper exhaustion as to Defendant Herndon's excessive use of force and failure to intervene, these claims should be dismissed. See Pavao, 679 F. App'x at 824 (affirming dismissal for failure to exhaust when "[t]he facts alleged in [defendants'] motion to dismiss and [plaintiff's] response . . . demonstrate that [plaintiff] did not complete the administrative process in accordance with the applicable grievance procedures . . .").

For these reasons, I **RECOMMEND** the Court **GRANT** this portion of Defendants' Motion and **DISMISS** Plaintiff's excessive force and failure to intervene claims against Defendant Herndon.

### 2. *Plaintiff's First Amendment Retaliation Claims*

Defendants also assert that Plaintiff failed to exhaust administrative remedies regarding his First Amendment retaliation claims. Doc. 21-1 at 7; Doc. 32 at 3. In support of their claim, Defendants point to the evidence on record showing "Plaintiff filed one grievance in 2016 and never complained of retaliation." Doc. 28 at 3. Plaintiff never directly refutes this claim, nor does Plaintiff assert he filed a retaliation grievance which was not processed or that he was, for whatever reason, prevented from doing so. Moreover, the grievance Plaintiff asserts he submitted on October 25, 2016, doc. 24-6 at 10, makes no mention of any retaliation, and even if it did, it would not be sufficient because, as discussed above, Plaintiff never appealed.

I, therefore, **RECOMMEND** the Court **GRANT** this portion of Defendants' Motion and **DISMISS** Plaintiff's retaliation claims against Defendants Jackson, Hutcheson, Allen, and Toole.

### 3. *Plaintiff's Procedural Due Process Claims*

Plaintiff asserts a procedural due process claim based on his assignment to the Tier II program. Defendants contend that the claim should be dismissed because Plaintiff failed to exhaust administrative remedies concerning that assignment. Specifically, Defendants assert there is no evidence Plaintiff appealed his Tier II classification within three days of receipt of the program assignment memo, as required by SOP IIB09-0003, and provide documents showing the prison lacks any record of such a filing. Doc. 21-1 at 8; Doc. 21-2 at 7; Doc. 21-6 at 2; Doc. 28 at 4–5. Plaintiff disagrees and alleges he appealed his Tier II classification by submitting his appeal to Counselor Colwell and submits what he asserts is a signed receipt of the appeal and written response concerning the appeal. Doc. 24-1 at 2; Doc. 24-6 at 7; Doc. 32 at 3. For the reasons set forth below, I find that the evidence demonstrates Plaintiff appealed his Tier II assignment, and that Counselor Colwell accepted the appeal, provided Plaintiff a receipt of the appeal, and sent the appeal for processing on or around October 25, 2016.

Unlike the generalized grievance policy, SOP IIB09-0003 (the policy governing the Tier II program) provides only one level of review.[7] Inmates may appeal the warden's decision placing them in the Tier II program to the Director of Field Operations, and the Director's decision is final. See Doc. 21-4 at 7. There are no additional levels of review, nor are there any

---

[7]     SOP IIB05-0001 utilizes a two-step grievance process where an inmate first submits a formal grievance and then, after receiving a decision or after the time for a decision passes without a response, the inmate submits an appeal. Doc. 21-3 at 9–15; see Whatley II, 898 F.3d at 1075 n.3 (noting past SOPs employed a three-step process, requiring informal grievances before formal ones, but has since been amended to eliminate that requirement). In contrast, SOP IIB09-0003 employs only one level of review through which inmates appeal the decisions regarding their placement in the program. Doc. 21-4 at 6–7, 9–11.

procedures for when an appeal is filed but no response is given.  See id.  Because Plaintiff alleges he appealed the assignment, and he was not required to take any additional steps under SOP IIB09-0003 after submitting the initial appeal, Plaintiff's allegations, taken as true, demonstrate proper exhaustion.  Consequently, the Court must move to the second step of the Turner test.

Plaintiff alleges he submitted his Tier II assignment appeal directly to Counselor Colwell on October 25, 2016, after his Tier II program assignment hearing, and that he received a receipt and written response from Counselor Colwell that same day.  Doc. 32 at 3.  In support of his allegations, Plaintiff provides the Court with a copy of the receipt of the appeal and written response.[8]  Doc. 24-1 at 1.  The receipt Plaintiff provided is signed by Counselor Colwell, is dated October 25, 2016, and is entitled "Offender Receipt for Administrative Segregation Tier II Program Assignment."[9]  Id.

The written response Plaintiff submits is on a form entitled "Counselor Request Form" and dated October 25, 2016.  Doc. 24-6 at 7.  The form contains Plaintiff's name, inmate number, and his assigned cell location.  Id.  While the form is not signed by Counselor Colwell, her name is typed at the top.  Id.  The first part of the form containing a space for inmates to write questions is blank, but the bottom half (the "response" half) contains ten handwritten lines. Id.  While the first eight lines refer to an open detainer, the bottom two lines show that the counselor wrote that she "sent [Plaintiff's] tier appeal to the unit mgr. for processing."  Id.  The

_____

[8]	There may be some confusion because Plaintiff also submitted a copy of his October 25, 2016, excessive force grievance form, doc. 24-6 at 10, described in earlier sections.  Based on the caption and contents of the grievance form, this is plainly not the Tier II appeal claims Plaintiff provided to Counselor Colwell.

[9]	Defendants suggest the receipt merely "purports" to have Counselor Colwell's signature.  Doc. 28 at 5.  Barring a direct allegation of fraud, the Court will not examine whether the signature was forged and accepts that the signature belongs to Counselor Colwell.

information provided in this document comports with other evidence on record and, thus, supports Plaintiff's contention that Counselor Colwell provided this response. For example, on the written response form, Plaintiff's cell location is listed as "E-34T," and the evidence Defendants provided related to Plaintiff's movement history shows that Plaintiff was indeed housed in cell "E-3-4-T" on October 25, 2016. Id.; Doc. 21-5 at 2. The written response is also consistent with the receipt, which is entitled "Offender Receipt for Administrative Segregation Tier II Program Assignment." Doc. 24-1 at 1.

Finally, Plaintiff's allegation that he appealed his Tier II assignment is further supported by his January 4, 2017 grievance ("Grievance No. 234467") where he writes that he has "been waiting since I been on Tier Two to receive a response to my appeal for Tier Two[,] and that he "ha[s] the receipt from Counselor Colwell, but [he] never received a response." Doc. 21-8 at 3; see also White v. Staten, 672 F. App'x 919, 924 (11th Cir. 2016) (finding evidence supporting plaintiff-inmate's statement "that he submitted a grievance . . . but it simply was not processed as it should have been" included "letters he sent to various prison officials . . . in which he repeatedly and emphatically stated that he hand-delivered a grievance . . . but [did not receive] a grievance receipt").

As noted, Defendants argue there is no evidence Plaintiff appealed his Tier II classification within three days of receipt of the program assignment memo and provide documents showing the prison lacks any record of such a filing. Doc. 21-1 at 8; Doc. 21-2 at 7; Doc. 21-6 at 2; Doc. 28 at 4–5. The fact that the prison may lack record of the appeal is consistent with—not contrary to—Plaintiff's claim that he submitted the appeal, but it was not processed. Moreover, Plaintiff has offered documentary evidence demonstrating that he did, in fact, submit the appeal. Based on the record before the Court, I find that Plaintiff submitted an

appeal to Counselor Colwell on or around October 25, 2016, and Counselor Colwell provided a receipt and written response of the appeal to Plaintiff.

The Court must also determine whether Plaintiff's appeal was timely and properly filed. Under SOP IIB09-0003, Plaintiff was required to file his appeal within three days of receipt of the Tier II program assignment memo.[10] Doc. 21-4 at 7, 20. The record is silent as to when Plaintiff received the program assignment memo, but Plaintiff asserts that his program assignment hearing occurred on October 25, 2016. Doc. 32 at 2; see also Doc. 21-2 (discussing Plaintiff's Tier II classification appeal deadline based on a hypothetical program assignment on October 30, 2016). Defendants do not dispute this date or offer any contrary evidence. The SOP provides that the warden (or designee) has up to seven days after the program assignment hearing to issue a decision, after which the inmate receives notice through the program assignment memo. Doc. 21-4 at 6–7. Under the SOP, it is possible that an inmate could receive the program assignment memo on the same day as the hearing.

Defendants have argued that Plaintiff did not submit *any* appeal and, therefore, the appeal was not timely or proper. But, I have found that Plaintiff did submit the appeal on or about October 25, 2016, and that under the SOP that submission could have been, and likely was, submitted within SOP's appeal deadline. In absence of any other evidence, the record before the Court demonstrates Plaintiff's appeal was proper and timely.

Finally, Defendants argue there is no evidence Plaintiff appealed "to the Director of Field Operations," as SOP IIB09-0003 requires. Doc. 21-1 at 8; Doc. 21-2 at 8. However, the SOP requires Plaintiff "submit his appeal to his or her assigned counselor for processing by the Tier II

---

[10]     As discussed above, the three days begins when the inmate's "receipt of the notice" (through the program assignment memo) of the warden's approval of the Tier II classification, not when the inmate is assigned to the program or when the incident triggering assignment to the program occurred. Doc. 21-4 at 7, 19–20.

Program Unit Manager's office." Doc. 21-4 at 7. Though the appeal is ultimately reviewed by the Director of Field Operations, SOP IIB09-0003 only requires inmates submit the appeal to their counselor. Id. The written response discussed above shows Plaintiff submitted the appeal to Counselor Colwell, who wrote she would forward it to the unit manager for processing. Therefore, I find that Plaintiff properly appealed his Tier II assignment and, thus, exhausted administrative remedies regarding his procedural due process claim for his initial assignment to the Tier II program.

For these reasons, I **RECOMMEND** the Court **DENY** this portion of Defendants' Motion to Dismiss relating to Plaintiff's failure to exhaust administrative remedies for his procedural due process claim. Accordingly, I turn to whether Plaintiff's due process claim is subject to dismissal for failure to state a claim.

## II.     Procedural Due Process and Failure to State a Claim

Defendants argue Plaintiff's procedural due process claim should be dismissed because he failed to assert facts showing a protected liberty interest. Doc. 21-1 at 18–20. Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." Quintanilla v. Bryson, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)).

When evaluating whether to dismiss a case or claim at the motion to dismiss stage, the Court "accept[s] the facts of the complaint as true and view[s] them in the light most favorable to the nonmoving party." Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004). Dismissal is appropriate when it appears that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. Here, the relevant inquiry is limited to whether the facts, as alleged by Plaintiff, create a protected liberty interest.

"Determining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word." Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999); see also Jacoby v. Baldwin County, 835 F.3d 1338, 1346 (11th Cir. 2016) (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999)).  In Sandin v. Conner, the Supreme Court rejected tests which determined categorical liberty interests through analysis of the language and structure of the state's laws and policies. 515 U.S. 472, 483–85 (1995).  Rather, the Supreme Court held that, in evaluating whether a due process liberty interest exists, courts should examine the conditions of confinement, not the language or structure of the state law or the prison's grievance policies.  Id.

The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required.  Kirby, 195 F.3d at 1290–91.  First, there is a protected due process liberty interest "when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court."  Id.; Sandin, 515 U.S. at 484.  Secondly, a state-created due process liberty interest may arise "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Kirby, 195 F.3d at 1291 (quoting Sandin, 515 U.S. at 484); see also Smith v. Deemer, 641 F. App'x 865, 868 (11th Cir. 2016) ("Atypical and significant hardships must also be severe relative to regular prison."); Jacoby, 835 F.3d at 1346–47 ("This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life."); Magluta, 375 F.3d at 1276.

Plaintiff asserts he has been held in administrative segregation (the Tier II program) since he was attacked by another inmate on September 30, 2016.  Doc. 8 at 6–9.  Though the prison later dismissed the disciplinary report against him, Plaintiff remained in the Tier II program for

nearly two years, and his appeal was never processed. Doc. 32 at 7–8. Plaintiff completed all

three phases of the Tier II program in August 2017, around eleven months after his initial

assignment but did not receive a timely review. Id. at 4–8. Instead, he was required to start the

program all over again. Id. Construing his pleadings liberally, the Court finds Plaintiff alleges

that, during his placement in the Tier II program, he has been forced to undergo a "behavioral

modification program." Doc. 8 at 8. He received "inadequate food portions," which are less

than the portions received in general population and less than his medically-prescribed diet

requires. Id.; Doc. 24 at 2; Doc. 32 at 7. Additionally, Plaintiff alleges he is subjected to

widespread misuse of riot spray in the program's assigned housing, aggravating his asthma.

Doc. 24 at 2. Finally, Plaintiff alleges he could not complete a work-release program or enter a

transitional center, a condition which he alleges the parole board requires he complete before he

can be considered for parole. Doc. 8 at 10; Doc. 24 at 4; Doc. 32 at 8.

First, Plaintiff argues that his continued assignment to the Tier II program was so severe

that it essentially exceeded the sentence imposed. Doc. 24 at 4. For this claim to survive the

motion to dismiss stage, Plaintiff must allege facts showing that the actions of prison

administration "inevitably affect the duration of his sentence." See Sandin, 515 U.S. at 487;

Mathews v. Moss, 506 F. App'x 981, 983 (11th Cir. 2013) ("Inmates also have no protected

liberty interest in a particular custody classification."). While Plaintiff alleges that the parole

board "required" he complete a work-release program at a transitional center, he does not explain

anything more about the source or scope of this requirement. Compare Kramer v. Donald, 286

F. App'x 674, 677 (11th Cir. 2008) (finding no due process liberty interest when an inmate who

was not convicted of a sex offense was required to participate in sex offender treatment as a

precondition to parole because "the precondition did not deprive him of parole consideration and

because participation in the program would not guarantee a grant of parole . . . ."), with

Wilkinson v. Austin, 545 U.S. 209, 211 (2005) (finding atypical and significant hardship when supermax confinement prohibited almost all human contact, lasted indefinitely with only annual reviews, and assigned inmates were automatically ineligible for parole).  Thus, Plaintiff does not have a cognizable liberty interest based on the impact on his parole eligibility alone.

Having found that Plaintiff's Tier II assignment did not essentially exceed his sentence, the question shifts to whether the conditions of Plaintiff's administrative confinement imposed an "atypical and significant hardship."  In determining whether the prison conditions and policies, taken together, create a liberty interest, "[b]oth the period of time and the severity of the hardships must be taken into consideration."  Delgiudice v. Primus, 679 F. App'x 944, 947 (11th Cir. 2017); see also Wilkinson, 545 U.S. at 224 (observing that conditions which "standing alone might not be sufficient to create a liberty interest" may, when "taken together . . . impose an atypical and significant hardship within the correctional context").  The duration of Plaintiff's time in the Tier II program weighs in favor of a liberty interest.  Compare Williams v. Fountain, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (observing year-long confinement in administrative segregation created a protected liberty interest), with Smith, 641 F. App'x at 868 (finding a 15- to 30-day period in disciplinary confinement did not create a liberty interest), and Thomas v. Warner, 237 F. App'x 435, 438 (11th Cir. 2007) ("Plaintiff's 20 days in isolation was not an excessive, atypical or significant hardship that would implicate the Due Process Clause.").

However, while Plaintiff's allegations of frequent use of riot spray and medically inadequate food portions demonstrate harsher sanctions than found in general population, they do not show the conditions in Tier II deviated in a severe enough way as to give rise to a liberty interest.  See Morefield v. Smith, 404 F. App'x 443, 446 (11th Cir. 2010) (holding a "four-year confinement in administrative segregation" did not give rise to a liberty interest because, despite the "lengthy" duration, "when weighed against other factors in his case" it appeared "the

conditions of his confinement were generally equivalent to general prison population conditions"). Because Plaintiff's confinement has occurred under conditions substantially similar to those experienced by inmates in general population, he did not experience "atypical or significant hardship" through his assignment to the Tier II program. Compare Turner v. Warden, GDCP, 650 F. App'x 695, 700 (11th Cir. 2016) (determining plaintiff-inmate's confinement in supermax resembled ordinary prison life because plaintiff received regular meals, recreation, shower time, and weekend visits and often had access to a television in his cell), and Moulds v. Bullard, 345 F. App'x 387, 396 (11th Cir. 2009) (finding disciplinary confinement conditions, including temporary withdrawal of visitation privileges, deprivation of one meal a day, and lack of a mattress during daylight hours, did not create a liberty interest), and Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006) (holding that a three-year administrative confinement which "occurred under conditions substantially similar to those experienced by [prisoners in] general population" did not create a liberty interest), with Quintanilla, 730 F. App'x at 743 (noting plaintiff pled sufficient facts to show his assignment in the Tier II program "appear to establish . . . atypical and significant hardship" when the plaintiff alleged long-term placement in vermin-infested isolation cells, systematic starvation, lack of basic hygiene supplies, and regular denials of recreation and human contact), and Magluta, 375 F.3d at 1282 (finding a liberty interest when Plaintiff alleged he was confined for 500 days under "extremely harsh conditions" while "locked in an extremely small, closet-sized space" with little human contact).

As the facts contained in the record before the Court are insufficient to give rise to a liberty interest, I **RECOMMEND** the Court **GRANT** this portion of Defendants' Motion to Dismiss and **DISMISS** Plaintiff's procedural due process claim for failure to state a claim upon which relief may be granted. As no claims remain pending, it is unnecessary for the Court to address Defendants' qualified immunity and damages arguments.

## CONCLUSION

I **RECOMMEND** the Court **GRANT** Defendants' Motion, doc. 21, **DISMISS with prejudice** Plaintiff's procedural due process claims against Defendants Jackson, Hutcheson, Allen, and Toole for failure to state a claim, and **DISMISS without prejudice** Plaintiff's excessive force and failure to intervene claims against Defendant Herndon and Plaintiff's retaliation claims against Defendants Jackson, Hutcheson, Allen, and Toole for failure to exhaust available administrative remedies. I also **RECOMMEND** the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal and **DENY** Plaintiff leave to appeal *in forma pauperis*.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within 14 days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final

judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

   **SO ORDERED** and **REPORTED and RECOMMENDED**, this 12th day of March, 2019.

                  _____
                  BENJAMIN W. CHEESBRO
                  UNITED STATES MAGISTRATE JUDGE
                  SOUTHERN DISTRICT OF GEORGIA