**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

| | |
|---|---|
| RASHARD CHARLES CONNER, | |
| Plaintiff, | CIVIL ACTION NO.: 6:17-cv-10 |
| v. | |
| MARTY ALLEN; ROBERT TOOLE; SGT. NORRIS HERNDON; JOSEPH HUTCHESON; and VALARIE JACKSON, | |
| Defendants. | |

## <u>ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

This matter is before the Court on Plaintiff's Motion to Amend and Defendants' Motions to Dismiss.  Docs. 21, 38, 48.  For the reasons set forth below, I **GRANT** Plaintiff leave to amend his Complaint.  I **VACATE** the March 12, 2019 Report and Recommendation, doc. 37, and enter the following in its stead.  I **RECOMMEND** the Court **GRANT in part** Defendants' Motions to Dismiss, docs. 21, 48, and **DISMISS** Plaintiff's excessive force, failure to intervene, and retaliation claims for lack of proper exhaustion.  I **RECOMMEND** the Court **DENY in part** Defendants' Motions to Dismiss, docs. 21, 48, as the Motions relate to Plaintiff's procedural due process claim, Defendants' qualified immunity defense, and Defendants' damages limitation argument.  Further, the Court **GRANTS** Plaintiff's Motions to Join Documents and Motion to Receive Information.  Docs. 51, 53.  Finally, the Court **DENIES as moot** Plaintiff's Motion to Receive Information.  Doc. 55.

## PRELIMINARY MATTERS

In response to the Court's previous Report and Recommendation, doc. 37, Plaintiff filed a Motion to Amend, which is currently before the Court.  Doc. 38.  Defendants oppose Plaintiff's request to amend.[1]  Doc. 40.  Litigants may, as a matter of course, amend a pleading once within 21 days of service.  Fed. R. Civ. P. 15(a).  After 21 days pass, a contested amendment may only be filed with leave of court.  Id.  The Federal Rules of Civil Procedure provide that leave should be "freely" given "when justice so requires" and, thus, Rule 15 skews in favor of admissibility.  Id.; Foman v. Davis, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."); Halliburton & Assocs., Inc. v. Henderson, Few & Co., 774 F.2d 441, 443 (11th Cir. 1985); Duncan v. Marion Cty. Sheriff's Dep't, No. 5:03-cv-416, 2005 WL 8159841, at *2 (M.D. Fla. May 26, 2005).  I find that in this instance, Plaintiff has made a sufficient showing to warrant leave to amend, and, therefore, the Court **GRANTS** Plaintiff's Motion to Amend, doc. 38.  The Court will treat Plaintiff's previous filings, docs. 1, 8, 41, collectively as Plaintiff's Second Amended Complaint.

Plaintiff's Second Amended Complaint contains several new factual allegations which affect the Court's prior analysis; accordingly, the Court **VACATES** its March 12, 2019 Report and Recommendation.  Doc. 37.

---

[1]    In a previous Order, the Court reviewed Defendants' response in opposition.  Doc. 42.  Finding Defendants failed to show prejudice and that it was impossible to determine futility without first reviewing a copy of Plaintiff's proposed Second Amended Complaint, the Court deferred ruling on Plaintiff's request to amend and, instead, granted Plaintiff a 30-day extension to file a proposed Second Amended Complaint.  Doc. 42.  Plaintiff later clarified he intended a previously-filed supplemental complaint, doc. 41, to function as his Second Amended Complaint.  Doc. 43.

Before the Court now are Defendants' Motions to Dismiss.  Doc. 21 (moving to dismiss original complaint); Doc. 48 (moving to dismiss Plaintiff's Second Amended Complaint).[2]  In response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint, doc. 48, Plaintiff filed three separate Responses, docs. 50, 52, 54, and then filed two Motions to "Join Documents," docs. 51, 53, in which Plaintiff asks the Court to consider the three responses together as one response.  The Court **GRANTS** Plaintiff's Motions to Join Documents, docs. 51, 53, and will considered Plaintiff's three Responses, docs. 50, 52, 54, together as his Response to Defendants' Motions to Dismiss.  Finally, Plaintiff filed a Motion to Receive Information, doc. 55, in which Plaintiff requests a status of his claim.  The Clerk of Court sent a copy of the docket sheet to Plaintiff, and I **DENY as moot** Plaintiff's Motion to Receive Information.

To be clear, certain of Plaintiff's original claims have already been dismissed, and only his claims from excessive force, failure to intervene, retaliation, and violation of procedural due process rights remain pending.  Docs. 9, 20.  Accordingly, the Court will now address Defendants' Motions to Dismiss, docs. 21, 48, seeking dismissal of Plaintiff's pending claims, as those claims have been alleged in Plaintiff's Second Amended Complaint.

## FACTUAL BACKGROUND

On January 11, 2017, Plaintiff, while incarcerated at Georgia State Prison ("GSP") in Reidsville, Georgia, brought this action under 42 U.S.C. § 1983 to challenge certain conditions of his confinement.  Doc. 8.  Plaintiff alleges he was attacked by another inmate on September 30, 2016, and Defendant Herndon, instead of protecting him, sprayed him in the face with pepper

---

[2]     Defendants' Motion to Dismiss Plaintiff's Amended Complaint is a short filing that, at base, argues that Plaintiff's Amended Complaint should be dismissed for the same reasons Defendants argued in their original motion to dismiss and for the reasons stated in the Court's March 12, 2019 Report and Recommendation.  Doc. 48.  Thus, the Court considers the two Motions to Dismiss, docs. 21, 48, together and does not distinguish between the two Motions here, given that the arguments raised in the Motions are identical.

spray and temporarily blinded him.  Id. at 6.  As a result of the fight, the prison issued a

disciplinary report against Plaintiff and, at some point in October or November 2016, placed

Plaintiff in the Tier II program, a form of administrative segregation.  Id. at 6–7; Doc. 32 at 4–5.

Plaintiff asserts he did not instigate the fight or defend himself against the other inmate and the

disciplinary report issued against him was expunged on appeal.  Doc. 8 at 8; Doc. 24-6 at 2; Doc.

32 at 2.  However, Plaintiff alleges Defendants Jackson and Hutcheson did not move Plaintiff

back to general population, even after the disciplinary report was expunged.  Doc. 32 at 7.

According to Plaintiff, these Defendants placed Plaintiff in administrative segregation and

ensured he remained there to silence him.  Doc. 8 at 6.  Plaintiff alleges he did not receive a

timely Tier II review and was improperly forced to restart the Tier II program.  Doc. 41 at 2.

Plaintiff alleges that he was assigned to Tier II until May 23, 2018, a period of almost two years.

Doc. 32 at 2; Doc. 41 at 8.  Explained in more detail below, Plaintiff alleges that the conditions

of Tier II confinement at GSP are significantly harsher than the conditions associated with

general population.  Plaintiff also alleges that his assignment to Tier II interfered with his parole

eligibility.  Doc. 41 at 1.

## DISCUSSION

### I.    Exhaustion of Administrative Remedies

#### A.    Legal Requirements for Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), an incarcerated individual must

properly exhaust all available administrative remedies—the prison's internal grievance

procedures—before filing a federal lawsuit to challenge prison conditions.  42 U.S.C.

§ 1997e(c)(1); see Jones v. Bock, 549 U.S. 199, 202 (2007); Harris v. Garner, 216 F.3d 970, 974

(11th Cir. 2000).  The purpose of the PLRA's exhaustion requirement is to "afford corrections

officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Whatley v. Warden, Ware State Prison (Whatley I), 802 F.3d 1205, 1208 (11th Cir. 2015) (quoting Woodford v. Ngo, 548 U.S. 81, 93 (2006)).  Exhaustion is a mandatory requirement, and courts have no discretion to waive it or excuse it based on improper or imperfect attempts to exhaust, no matter how sympathetic the case or how special the circumstances.  Ross v. Blake, 136 S. Ct. 1850, 1857 (2016) (finding that the PLRA requires exhaustion irrespective of any special circumstances and its mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account); Jones, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").  Moreover, courts may not consider the adequacy or futility of the administrative remedies afforded to the inmate.  Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000).  Rather, courts may only determine whether administrative remedies are available and whether the inmate properly exhausted these remedies prior to filing suit.  Id.

Exhaustion must be proper, and proper exhaustion requires compliance with the prison's administrative policies, deadlines, and other critical procedural rules.  Woodford, 548 U.S. at 91–92; Bryant v. Rich, 530 F.3d 1368, 1378 (11th Cir. 2008) ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'" (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005))).  The prison's administrative grievance policies delineate what procedural steps prisoners must follow to fully exhaust.  Jones, 549 U.S. at 218; Bracero v. Sec'y, Fla. Dep't of Corr., 748 F. App'x 200, 202 (11th Cir. 2018) ("To satisfy the exhaustion requirement, a prisoner must complete the administrative process in accordance with the applicable grievance procedures established by the

prison.").  Proper exhaustion requires prisoners to do more than simply initiate a grievance; they must correctly follow all procedural rules set out in the institution's policy—including time limits—and must appeal any denial of relief through all levels of review that comprise the agency's administrative grievance process.  Johnson, 418 F.3d at 1159 ("Prisoners must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures before filing a federal claim."); Sewell v. Ramsey, No. 4:06-cv-159, 2007 WL 201269, at *3–4 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies); see also Porter v. Sightler, 457 F. App'x 880, 882 (11th Cir. 2012) (affirming dismissal based on lack of exhaustion when plaintiff-inmate failed to file a grievance within ten days of the incident as required by Georgia Department of Corrections' policy).

### B.    Standard of Review for Exhaustion

Failure to exhaust administrative remedies is an affirmative defense, and inmates are not required to specially plead or demonstrate exhaustion in their complaint.  Jones, 549 U.S. at 216; Pearson v. Taylor, 665 F. App'x 858, 867 (11th Cir. 2016); Whatley I, 802 F.3d at 1209.  "In response to a prisoner lawsuit, defendants may file a motion to dismiss and raise as a defense the prisoner's failure to exhaust administrative remedies."  Pearson, 665 F. App'x at 867.  Additionally, "[w]hen ruling on a motion to dismiss for failure to exhaust administrative remedies, the court may consider evidence outside the pleadings."  White v. Berger, 709 F. App'x 532, 541 n.4 (11th Cir. 2017) (citing Bryant, 530 F.3d at 1376); Glenn v. Smith, 706 F. App'x 561, 563–64 (11th Cir. 2017); Singleton v. Dep't of Corr., 323 F. App'x 783, 785 (11th Cir. 2009) ("A district court may properly consider facts outside of the pleadings to resolve a

factual dispute regarding exhaustion where the factual dispute does not decide the merits and the parties have a sufficient opportunity to develop the record." (citing <u>Bryant</u>, 530 F.3d at 1376)).

In <u>Turner v. Burnside</u>, the Eleventh Circuit laid out a two-part test for resolving motions to dismiss for failure to exhaust administrative remedies under § 1997e(a). 541 F.3d 1077, 1080–82 (11th Cir. 2008). First, courts "look[] to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true." <u>Id.</u>; <u>see also</u> <u>Bracero</u>, 748 F. App'x at 202–03. This prong of the <u>Turner</u> test ensures there is a genuine dispute of material fact regarding the inmate-plaintiff's failure to exhaust. <u>Glenn</u>, 706 F. App'x at 563–64 (citing <u>Turner</u>, 541 F.3d at 1082); <u>Pavao v. Sims</u>, 679 F. App'x 819, 824 (11th Cir. 2017). "The court should dismiss [the action] if the facts as stated by the prisoner show a failure to exhaust." <u>Abram v. Leu</u>, 759 F. App'x 856, 860 (11th Cir. 2019) (quoting <u>Whatley I</u>, 802 F.3d at 1209); <u>Turner</u>, 541 F.3d at 1082 ("This process is analogous to judgment on the pleadings under Federal Rule of Civil Procedure 12(c).").

"If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." <u>Turner</u>, 541 F.3d at 1082; <u>see also</u> <u>Glenn</u>, 706 F. App'x at 563–64; <u>Pearson</u>, 665 F. App'x at 867 ("At the second step, the court [is] permitted to make factual findings to resolve the issue of exhaustion."). After resolving the factual disputes, the court then decides whether, "based on those findings, defendants have shown a failure to exhaust." <u>Bracero</u>, 748 F. App'x at 202–03 (quoting <u>Whatley I</u>, 802 F.3d at 1209).

**C.     Exhaustion: Plaintiff's Excessive Force and Retaliation Claims**

The Georgia Department of Corrections' grievance policies are set out in Standard Operating Procedure ("SOP") IIB05-0001.  Whatley I, 802 F.3d at 1208.  SOP IIB05-0001 contains the policy for general grievances.  See Whatley v. Smith (Whatley II), 898 F.3d 1072, 1074 (11th Cir. 2018) ("To exhaust administrative remedies under the Georgia Department of Corrections . . . SOP, inmates must follow the . . . prison grievance process outlined in SOP IIB05-0001.").  Under SOP IIB05-0001, inmates may "file a grievance about any condition, policy, procedure, or action or lack thereof" which "affects the offender personally" and which is not explicitly listed in the SOP as a "non-grievable issue."  Doc. 21-3 at 7.  Under SOP IIB05-0001, inmates cannot file grievances about "[i]nvoluntary assignments to administrative segregation."[3]  Id.  Rather, SOP IIB09-0003 outlines the procedure by which inmates may contest placement in Tier II administrative segregation.  Doc. 21-4.

*1.     Exhaustion Under SOP IIB05-0001*

Under SOP IIB05-0001, inmates must file grievances within 10 days of becoming aware of the facts from which the grievance arises.  Whatley II, 898 F.3d at 1075; Shaw v. Toole, No. 6:14-CV-48, 2015 WL 4529817, at *5 (S.D. Ga. July 27, 2015).  The grievance is screened by a Grievance Counselor, who determines whether to accept the grievance for processing.  Shaw, 2015 WL 4529817, at *5.  Inmates may "hand deliver" a completed grievance form to any counselor, who will provide the offender with a receipt.  Doc. 21-3 at 9.  If the grievance is accepted for processing, the warden has 40 days to review the grievance and determine whether to grant or deny it.  Shaw, 2015 WL 4529817, at *5.  If the grievance goes unanswered, the

---

[3]     However, offenders may still file grievances "alleging retaliation or harassment" under SOP IIB05-0001, even if the alleged retaliation or harassment relates to a disciplinary action, housing or program assignment, or transfer between institutions.  Id. at 8.

inmate may appeal the non-response after the warden's time to answer expires.  Id. ("An inmate

can file an appeal with the Commissioner's Office in the following instances: if the grievance

coordinator rejects his original grievance; after the warden responds to the original grievance; or

when the time allowed for the warden's decision has expired."); see also, Whatley I, 802 F.3d at

1208 ("If the warden does not respond within forty days . . . the prisoner may appeal[.]").

2.    <i>Exhaustion of Plaintiff's Excessive Force Claims</i>

Plaintiff's excessive force and deliberate indifference claims relate to the September 30,

2016 incident where Plaintiff alleges Defendant Herndon violated his constitutional rights by

pepper spraying Plaintiff and failing to defend him from an attack by another inmate.  Doc. 8 at

5–6, 9.  Under SOP IIB05-0001, Plaintiff was required to file his grievance against Defendant

Herndon for excessive force and deliberate indifference by October 10, 2016 (10 days from the

alleged incident).[4]  If the 10-day window had passed, Plaintiff could have filed an untimely

grievance and then shown good cause for its untimeliness.  Doc. 21-3 at 10 ; see Bryant, 530

F.3d at 1379 (finding a plaintiff failed to exhaust all administrative remedies when grievance

procedures were temporarily unavailable and plaintiff failed to file an out-of-time grievance once

the grievance process was available).

Plaintiff claims he could not file a timely grievance because prison officers failed to

provide him grievance forms and was unable to receive a grievance form until another inmate

gave him one on October 25, 2016.[5]  Doc. 32 at 2.  Plaintiff claims to have filed a grievance on

---

[4]    Though Plaintiff successfully appealed a disciplinary report filed against him, doc. 24-6 at 2, he
was also required to use the prison's general grievance procedures to grieve the September 30, 2016
actions from which his excessive force and deliberate indifference claims arise.

[5]    Plaintiff alleges that "officers in the building [where he was housed] stated that they had no
grievance forms at all."  Doc. 32 at 2.

9

October 27, 2016, outside of the 10-day window.[6]  Doc. 41 at 6.  Plaintiff alleges he submitted the grievance through "in house mail" but never received a receipt.  Doc. 32 at 2.  Nevertheless, Plaintiff retained a personal copy of the grievance form, which he submitted to the Court.  Doc. 24-6 at 10.  Defendants dispute whether Plaintiff ever filed this grievance.  Doc. 21-1 at 6–7; Doc. 28 at 2.  It is possible that Plaintiff's October 27, 2016 grievance is a valid step one grievance for the purposes of exhaustion.  Plaintiff claims his October 27, 2016 grievance was never processed.  Doc. 32 at 2.  As stated above, if prison officials have not responded to the step-one grievance within the prescribed window, a prisoner may file an appeal to the central office.  Doc. 21-3 at 14.  Assuming Plaintiff did properly submit his step-one grievance on October 27, 2016, he could have properly filed an appeal for a lack of response starting December 6, 2016.  Id. at 12.

Plaintiff claims to have filed Grievance Number 235986 as an appeal over the lack of response to his October 27, 2016 step-one grievance.  Doc. 41 at 6.  Exhibits submitted by Defendants indicate Grievance Number 235986 was filed on January 26, 2017—weeks after this lawsuit was filed on January 11, 2017.  Doc. 21-6 at 2; Doc. 1.  The Court need not make a determination of fact under Turner step two, as Plaintiff does not dispute the filing date of Grievance Number 235986.  541 F.3d at 1080–82.  Defendants' records, in conjunction with the information laid out in Plaintiff's Complaints, indicate Plaintiff filed this lawsuit *before* filing his grievance appeal and long before receiving an answer to that appeal.  "When a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that

---

[6]     The "date" field in Plaintiff's attached grievance contains the date October 25, 2016.  Doc. 24-6 at 10.  Although the face of this grievance contains this date, Plaintiff states he did not file the grievance until October 27, 2016.  Doc. 41 at 6.

procedure before pursuing a § 1983 lawsuit." <u>Brown v. Sikes</u>, 212 F.3d 1205, 1207 (11th Cir.

2000).  Because Plaintiff failed to exhaust his administrative remedies before he "brought" his

§ 1983 suit, I **RECOMMEND** the Court **GRANT in part** Defendants' Motion and **DISMISS**

Plaintiff's excessive force and deliberate indifference claims against Defendant Herndon.

3.     *Exhaustion of Plaintiff's First Amendment Retaliation Claims*

Defendants also assert Plaintiff failed to exhaust administrative remedies regarding his

First Amendment retaliation claims.  Doc. 21-1 at 7.  Plaintiff's October 27, 2016 grievance

makes no mention of retaliation by any Defendant.  Doc. 24-6 at 10.  Even if it did, for the

reasons stated above, Plaintiff did not properly exhaust all administrative remedies as to the

claims in that grievance before filing suit.  Defendants' records indicate—and Plaintiff does not

dispute—that only two other grievances were filed prior to Plaintiff's filing of this suit:

Grievance Numbers 234467 and 232489, and neither of those grievances contains any language

that could be construed to concern a claim for retaliation in violation of the First Amendment.[7]

Doc. 21-6 at 10, Doc. 21-7 at 4; Doc. 21-8 at 3.  Accordingly, I **RECOMMEND** the Court

**GRANT in part** Defendants' Motion and **DISMISS** Plaintiff's First Amendment retaliation

claims against Defendants Jackson, Hutcheson, Allen, and Toole.

**D.     Exhaustion: Plaintiff's Procedural Due Process Claims**

1.     *Exhaustion Under SOP IIB09-0003*

The Tier II program is a "comprehensive facility-wide [s]egregation stratification plan

that manages the institutional conduct and programmatic need of offenders assigned to the

program."  Doc. 21-4 at 1.  The Tier II program was established "to protect staff, offenders, and

---

[7]       In Grievance Number 232489, Plaintiff grieves the deployment of riot control spray within administrative segregation.  Doc. 21-7 at 4.  In Grievance Number 234467, Plaintiff grieves the lack of response to his Tier II appeal and asks to be returned to general population.  Doc. 21-8 at 3.

the public from offenders[] who commit or lead others to commit violent, disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to the safety and security of the institutional operation." Id.  The program operates as "an offender management process . . . not a punishment measure" and creates "an incentive program-based level of privileges" based on "offender behavior and program compliance." Id. at 4–5.  The program consists of three phases which the offender may progress through "based upon the offender meeting or failing to meet the goals outlined in the offender's individualized case plan." Id.

(a)     Initial Assignment Appeals Procedure

When an inmate is recommended for the Tier II program, the Classification Committee reviews the recommendation, determines eligibility, and submits its own recommendation to the warden, who must deny or approve the request within seven days. Id. at 5–6.  Once the inmate is assigned to the Tier II program, the Classification Committee holds an administrative segregation hearing within 96 hours of the assignment. Id. at 6.  Once the warden approves the inmate's assignment in the Tier II program, the inmate will receive a Tier II Program Assignment Memo detailing the reasons for assignment. Id. at 7, 20.  Inmates may appeal their initial assignment by submitting a completed Tier II Program Assignment Appeal Form within three business days of receipt of the Memo. Id. at 7, 19–20.  Offenders must submit their appeals form to their "assigned counselor for processing by the Tier II Program Unit Manager's office." Id. at 7.  The Director of Field Operations will then review the appeal and send the "final decision" to the warden within 14 business days. Id.  SOP IIB09-0003 contains no mechanism for appealing a final decision from the Director of Field Operations.

(b)     The 90-Day Review Appeals Procedure

12

After an inmate has been in the Tier II program for 90 days, he will have an in-person meeting with the Classification Committee, which is a "culmination of the previous informal . . . contacts that have been completed as part of the routine case management practices."  Id. at 9–10.  At this meeting, the Classification Committee review the counselor's recommendation to determine whether the inmate will: (1) transition from one phase to the next phase; (2) remain in the current phase or reassigned to a previous phase until the next 90 day review; (3) be assigned to the Tier I segregation program or general population upon completion of the Tier II program; or (4) be reassigned to the current phase at another facility or in GDOC's high max unit.  Id.  In making its recommendation, the Classification Committee provides specific reasons for its recommendation and will consider the inmate's: length of time in the current phase; continued facility risk; number, type, and frequency of disciplinary reports; progress in the Tier II program; and demeanor with staff in the Tier II living areas and during periodic reviews.  Id.  Once the warden or designee approves the Classification Committee's recommendation, the inmate will be served with a copy of the action in the form of a Tier II Program 90-Day Review Memo.  Id. at 10–11, 19–20.  Inmates who remain on the Tier II Program after their initial 90-day review will receive another review every 90 days.  Id. at 10–11.

As with the initial placement in the Tier II program, the inmate may appeal the 90-day review with the warden within three business days of receipt of the notice, after which the warden or designee has seven days to respond.  Id.  The only material difference between the appeals process for the initial Tier II program assignment and the 90-day review is that for the 90-day review, the inmate must appeal using the Tier II Program 90-day Review Assignment Appeal Form.  Id. at 6–7, 10–11, 19–20.  Like Tier II assignment appeals, the 90-day review

appeals process contains only one level of review, and there is no procedure for contesting or appealing the warden's decision.  Id. at 10–11.

2.    *Exhaustion of Plaintiff's Procedural Due Process Claims*

Plaintiff asserts a procedural due process claim based on his assignment to the Tier II program.  Doc. 8 at 10; Doc. 41 at 2.  Defendants contend the claim should be dismissed because Plaintiff failed to exhaust administrative remedies concerning that assignment.  Specifically, Defendants assert there is no evidence Plaintiff appealed his Tier II classification within three days of receipt of the program assignment memo, as required by SOP IIB09-0003, and provide documents showing the prison lacks any record of such a filing.  Doc. 21-1 at 8; Doc. 21-2 at 7; Doc. 21-6 at 2; Doc. 28 at 4–5.  Plaintiff disagrees and alleges he appealed his Tier II classification by submitting his appeal to Counselor Colwell and submits what he asserts is a signed receipt of the appeal and written response concerning the appeal.  Doc. 24-1 at 2; Doc. 24-6 at 7; Doc. 32 at 3.  For the reasons set forth below, I find the evidence demonstrates Plaintiff timely appealed his Tier II assignment and that Counselor Colwell accepted the appeal, provided Plaintiff a receipt of the appeal, and sent the appeal for processing on or around October 25, 2016.

Unlike the generalized grievance policy, SOP IIB09-0003 (the policy governing the Tier II program) provides only one level of review.[8]  Inmates may appeal the warden's decision placing them in the Tier II program to the Director of Field Operations, and the Director's

---

[8]    SOP IIB05-0001 utilizes a two-step grievance process where an inmate first submits a formal grievance and then, after receiving a decision or after the time for a decision passes without a response, the inmate submits an appeal.  Doc. 21-3 at 9–15; see Whatley II, 898 F.3d at 1075 n.3 (noting past SOPs employed a three-step process, requiring informal grievances before formal ones, but has since been amended to eliminate that requirement).  In contrast, SOP IIB09-0003 employs only one level of review through which inmates appeal the decisions regarding their placement in the program.  Doc. 21-4 at 6–7, 9–11.

decision is final.  <u>See</u> Doc. 21-4 at 7.  There are no additional levels of review, nor are there any procedures for when an appeal is filed but no response is given.  <u>See id.</u>  Because Plaintiff alleges he appealed the assignment and he was not required to take any additional steps under SOP IIB09-0003 after submitting the initial appeal, Plaintiff's allegations, taken as true, demonstrate proper exhaustion.  Consequently, the Court must move to the second step of the <u>Turner</u> test.

Plaintiff alleges he submitted his Tier II assignment appeal directly to Counselor Colwell on October 25, 2016, after his Tier II program assignment hearing, and that he received a receipt and written response from Counselor Colwell that same day.  Doc. 32 at 3.  In support of his allegations, Plaintiff provides the Court with a copy of the receipt of the appeal and a written response.[9]  Doc. 24-1 at 1; Doc. 24-6 at 7.  The receipt Plaintiff provided is signed by Counselor Colwell, is dated October 25, 2016, and is entitled "Offender Receipt for Administrative Segregation Tier II Program Assignment."[10]  <u>Id.</u>

The written response Plaintiff submitted is on a form entitled "Counselor Request Form" and dated October 25, 2016.  Doc. 24-6 at 7.  The form contains Plaintiff's name, inmate number, and his assigned cell location.  <u>Id.</u>  While the Counselor Request Form is not signed by Counselor Colwell, her name is typed at the top.  <u>Id.</u>  The first part of the form, containing a space for inmates to write questions, is blank, but the bottom half (the "response" half) contains ten handwritten lines.  <u>Id.</u>  While the first eight lines refer to an open detainer, the bottom two

---

[9]     There may be some confusion because Plaintiff also submitted a copy of his excessive force grievance form dated October 25, 2016, doc. 24-6 at 10, described in earlier Sections.  Based on the caption and contents of the grievance form, this is plainly not the Tier II appeal Plaintiff provided to Counselor Colwell.

[10]    Defendants suggest the receipt merely "purports" to have Counselor Colwell's signature.  Doc. 28 at 5.  Absent a direct allegation of fraud, the Court will not consider whether the signature was forged and accepts that the signature belongs to Counselor Colwell.

lines show that the counselor wrote that she "sent [Plaintiff's] tier appeal to the unit mgr. for processing." Id. The information provided in this document comports with other evidence on record and, thus, supports Plaintiff's contention that Counselor Colwell provided this response. For example, on the Counselor Request Form, Plaintiff's cell location is listed as "E-34T," and the evidence Defendants provided related to Plaintiff's movement history shows that Plaintiff was indeed housed in cell "E-3-4-T" on October 25, 2016. Id.; Doc. 21-5 at 2. The Counselor Request Form is also consistent with the receipt, which is entitled "Offender Receipt for Administrative Segregation Tier II Program Assignment." Doc. 24-1 at 1.

Finally, Plaintiff's allegation that he appealed his Tier II assignment is further supported by his January 4, 2017 grievance (Grievance Number 234467), where he writes that he has "been waiting since I been on Tier Two to receive a response to my appeal for Tier Two[,]" and that he "ha[s] the receipt from Counselor Colwell, but [he] never received a response." Doc. 21-8 at 3; see also White v. Staten, 672 F. App'x 919, 924 (11th Cir. 2016) (finding evidence supporting plaintiff-inmate's statement "that he submitted a grievance . . . but it simply was not processed as it should have been" included "letters he sent to various prison officials . . . in which he repeatedly and emphatically stated that he hand-delivered a grievance . . . but [did not receive] a grievance receipt").

Defendants argue there is no evidence Plaintiff appealed his Tier II classification within three days of receipt of the program assignment memo and provide documents showing the prison lacks any record of such a filing. Doc. 21-1 at 8; Doc. 21-2 at 7; Doc. 21-6 at 2; Doc. 28 at 4–5. The fact that the prison may lack record of the appeal is consistent with—not contrary to—Plaintiff's claim that he submitted the appeal, but it was not processed. Moreover, Plaintiff has offered documentary evidence demonstrating that he did, in fact, submit the appeal. Based

on the record before the Court, I find Plaintiff submitted an appeal to Counselor Colwell on or around October 25, 2016, and Counselor Colwell provided a receipt and written response of the appeal to Plaintiff.

The Court must also determine whether Plaintiff's appeal was timely and properly filed. Under SOP IIB09-0003, Plaintiff was required to file his appeal within three days of receipt of the Tier II program assignment memo.[11]  Doc. 21-4 at 7, 20.  The record is silent as to when Plaintiff received the program assignment memo, but Plaintiff asserts that his program assignment hearing occurred on October 25, 2016.  Doc. 32 at 2; see also Doc. 21-2 (discussing Plaintiff's Tier II classification appeal deadline based on a hypothetical program assignment on October 30, 2016).  Defendants do not dispute this date or offer any contrary evidence.  The SOP provides the warden (or designee) up to seven days after the program assignment hearing to issue a decision, after which the inmate receives notice through the program assignment memo.  Doc. 21-4 at 6–7.  Under the SOP, it is possible that an inmate could receive the program assignment memo on the same day as the hearing.

Defendants argue Plaintiff did not submit *any* appeal and, therefore, the appeal was not timely or proper.  But I have found Plaintiff did submit the appeal on or about October 25, 2016, and that under the SOP that submission was, therefore, submitted within SOP's appeal deadline. In absence of any other evidence, the record before the Court demonstrates Plaintiff's appeal was proper and timely.

Finally, Defendants argue there is no evidence Plaintiff appealed "to the Director of Field Operations," as SOP IIB09-0003 requires.  Doc. 21-1 at 8; Doc. 21-2 at 8.  However, the SOP

---

[11]     As discussed above, the three days begins when the inmate's "receipt of the notice" (through the program assignment memo) of the warden's approval of the Tier II classification, not when the inmate is assigned to the program or when the incident triggering assignment to the program occurred.  Doc. 21-4 at 7, 19–20.

requires Plaintiff "submit his appeal to his or her assigned counselor for processing by the Tier II Program Unit Manager's office."  Doc. 21-4 at 7.  Though the appeal is ultimately reviewed by the Director of Field Operations, SOP IIB09-0003 only requires inmates submit the appeal to their counselor.  Id.  The written response discussed above shows Plaintiff submitted the appeal to Counselor Colwell, who wrote she would forward it to the unit manager for processing. Therefore, I find that Plaintiff properly appealed his Tier II assignment and, thus, exhausted administrative remedies regarding his procedural due process claim for his initial assignment to the Tier II program.

For these reasons, I **RECOMMEND** the Court **DENY** this portion of Defendants' Motions to Dismiss relating to Plaintiff's failure to exhaust administrative remedies for his procedural due process claim.  Accordingly, I turn to whether Plaintiff's due process claim is subject to dismissal for failure to state a claim.

## II.    Plaintiff's Procedural Due Process Claims

### A.    Factual Background

Plaintiff's due process claim is based on his placement and time spent in Tier II administrative segregation.  Doc. 8 at 7.  Plaintiff was placed in Tier II on or around September 30, 2016, after he received a disciplinary report related to an attack from another inmate.  Id. at 6–7; Doc. 32 at 4–5.  Plaintiff appealed the disciplinary report issued against him, and it was expunged on October 20, 2016.  Doc. 24-6 at 2.  Despite the expungement, Plaintiff remained assigned to Tier II until May 23, 2018, a period of almost two years.  Doc. 32 at 2; Doc. 41 at 8. Plaintiff alleges Defendants initially assigned him to the Tier II program without due process and as a form of punishment.  Doc. 8 at 6.  In his responses to Defendants' Motions to Dismiss, Plaintiff also claims Defendants failed to provide him with another 90-day review in August

2017 after he successfully completed phase III, the last phase of the Tier II program, despite receiving no new disciplinary reports.  Doc. 24 at 3–4; Doc. 32 at 7–9; Doc. 41 at 1–2, 8–10. Instead, Plaintiff alleges that around October 2017, he was reassigned to phase I without a 90-day review and had to start the entire program over again.  Doc. 41 at 1–2, 8–12.  As explained in more detail below, Plaintiff alleges: (1) that his assignment to Tier II prevented his ability to obtain parole; and (2) the conditions of Tier II impose a significant hardship in relation to general population.

### B.      Legal Standard

When evaluating whether to dismiss a case or claim at the motion to dismiss stage, the Court "accept[s] the facts of the complaint as true and view[s] them in the light most favorable to the nonmoving party."  Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004).  In order to state a claim upon which relief may be granted, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not" suffice.  Twombly, 550 U.S. at 555.  At this stage, the Court accepts as true a plaintiff's factual allegations.  Waldman v. Conway, 871 F.3d 1283, 1289 (11th Cir. 2017).

Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process."  Quintanilla v. Bryson, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)).  Defendants

argue Plaintiff's procedural due process claim fails because he has failed to allege facts showing a deprivation of a protected liberty interest.[12]  Doc. 21-1 at 18–20; Doc. 48 at 3.

"Determining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word." Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999); see also Jacoby v. Baldwin County, 835 F.3d 1338, 1346 (11th Cir. 2016) (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999)).  In Sandin v. Conner, the United States Supreme Court rejected tests which determined categorical liberty interests through analysis of the language and structure of the state's laws and policies.  515 U.S. 472, 483–85 (1995).  Rather, the Supreme Court held that, in evaluating whether a due process liberty interest exists, courts should examine the conditions of confinement, not the language or structure of the state law or the prison's grievance policies.  Id.

The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required.  Kirby, 195 F.3d at 1290–91.  First, there is a protected due process liberty interest "when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court."  Id.; Sandin, 515 U.S. at 484.  Second, a state-created liberty interest may arise "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Kirby, 195 F.3d at 1291 (quoting Sandin, 515 U.S. at 484); see also Smith v. Deemer, 641 F. App'x 865, 868 (11th Cir. 2016) ("Atypical and significant hardships must also be severe relative to regular prison."); Jacoby, 835

---

[12]     Defendants do not address state action or adequacy of process in the Motions to Dismiss, and those elements are not address further here.

F.3d at 1346–47 ("This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life."); Magluta, 375 F.3d at 1276.

   C.     **Whether Plaintiff's Conditions of Confinement Essentially Exceed his Imposed Sentence**

   "[A] liberty interest may arise from the 'Due Process Clause of its own face,' which extends procedural safeguards to a prisoner when his liberty is restrained in a way that exceeds the sentence imposed by the court." Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007) (quoting Sandin, 515 U.S. at 484). Plaintiff argues the parole board "required" he complete a work-release program before he could be considered for parole. Doc. 24 at 4. In his Second Amended Complaint, Plaintiff alleges he "was given a parole date in 2010." Doc. 41 at 1. According to Plaintiff, the parole board "said that they would parole [him] out" on September 18, 2018, and all that he was required to do "was to complete a work release program." Id. He asserts that September 18, 2018 "was not a consideration date. That date was given to me." Id. (emphasis in original). He alleges Defendants prevented him from going to the transitional center at the time he was required to, thus stopping him "from doing what was mandated by the parole board." Id. at 2.

   As support for this claim, Plaintiff points to several previously filed exhibits which he incorporates into his Second Amended Complaint. Id. at 1–2, 7. He refers to a "case plan" which appears to be a print-out entitled "Offender Programs." Id. at 2; Doc. 24-6. This sheet contains, among other things, a table labeled "Current Plan" which shows three entries. For each entry, the table lists, among other things, the type and category of the program, the date identified, and the reason for the assignment. Doc. 24-6 at 5. One entry is for "Risk Reduction– Special Housing" with an "identified" date of April 2, 2012; the reason listed is "Required– Parole." Id. Plaintiff also includes an undated letter he wrote to Ms. Thompkins stating he is

"mandated to go to the halfway house before my parole date" and requesting the "earliest date that [he] may put in for one." Id. at 1. The signed reply, dated June 13, 2016, is contained on the same sheet of paper and states, "You can't go to a TC until around April or May of 2017. You must be out of Tier to go to a TC as well." Id. Plaintiff also points to a witness statement from Counselor Sheldon Ogden dated January 1, 2018. Id. at 35–36. In the statement, Ogden notes Plaintiff asked to be "put in for [a] Transition Center," that the request was "communicated to the chief counselor as well as the Deputy Warden[,] and [the request] was denied due to Offender Conner still [being] on Tier II . . . ." Id. Plaintiff also discusses multiple grievances and appeals he filed, including Grievance Number 261204. In Grievance Number 261204, Plaintiff writes that he "completed all these phases successfully, but [he] was reassigned to phase I which caused [him] to lose [his] T.P.M."[13] Id. at 25.

The Eleventh Circuit has determined that a Tentative Parole Month for Georgia Department of Corrections inmates is not a binding determination capable of creating a liberty interest under the Due Process Clause. Sultenfuss v. Snow, 35 F.3d 1494, 1497–1503 (11th Cir. 1994). Rather, it is well-settled that "the Georgia parole system does not create a liberty interest protected by the Due Process Clause, since 'the substantial discretion reserved by the Georgia Board of Pardons and Parole belies any claim to a reasonable expectation of parole.'" DelGiudice v. Primus, 679 F. App'x 944, 947–48 (11th Cir. 2017) (quoting Sultenfuss, 35 F.3d at 1499); Porter v. Ray, 461 F.3d 1315, 1318 (11th Cir. 2006) ("We have recognized that the [Georgia Parole] Board has 'virtually unfettered discretion to deviate both above and below the Guidelines recommendation in setting the TPM.'" (quoting Jones v. Ga. State Bd. of Pardons &

---

[13]    By TPM, Plaintiff is referring to his Tentative Parole Month. See, e.g., Bankhead v. Ga. State Bd. of Pardons & Paroles, 197 F. App'x 816, 817 (11th Cir. 2006) ("On 25 July 2002, the Board informed Bankhead that his tentative parole month ("TPM") was March 2005.")

Paroles, 59 F.3d 1145, 1150 (11th Cir. 1995))); see also Kramer v. Donald, 286 F. App'x 674,

677 (11th Cir. 2008) ("Kramer does not have a protected interest in parole consideration or

release due to the substantial discretion of the parole board."); Bankhead v. Ga. State Bd. of

Pardons & Paroles, 197 F. App'x 816, 817 (11th Cir. 2006) (dismissing an inmate's § 1983 claim

for a procedural due process violation when the parole board "improperly" changed his TPM

because "Georgia's parole system does not create a protected liberty interest in parole").

Plaintiff cites no changes in the law or its interpretation which would challenge this well-

settled determination.  See Porter, 461 F.3d at 1322 (finding no due process violation when the

Georgia Parole Board recalculated inmates' TPMs because the system did not "establish[] a

legitimate expectation of parole").  While Plaintiff may be legitimately frustrated about the loss

of his TPM, Defendants did not violate Plaintiff's due process rights concerning that TPM

because Plaintiff, as a Georgia inmate, had no legally cognizable liberty interest created by the

Georgia parole system.

> ### D.     Whether Plaintiff's Conditions of Confinement in Tier II Present an Atypical or Significant Hardship

Even when no liberty interest arises from the Due Process Clause itself, a prisoner may

maintain a claim for a procedural due process violation when an independent, state-created

liberty interest exists.  Though "[d]iscipline by prison officials in response to a wide range of

misconduct falls within the expected perimeters of the sentence imposed by a court of law,"

placement in disciplinary or administrative segregation may give rise to a state-created liberty

interest in certain conditions.  Shaarbay v. Palm Beach Cty. Jail, 350 F. App'x 359, 361 (11th

Cir. 2009) (quoting Sandin, 515 U.S. at 484–85).

A state-created liberty interest exists when the conditions of the segregated confinement

create an "atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life . . . ."  Quintanilla, 730 F. App'x at 743 (quoting Sandin, 515 U.S. at 484 ); Turner v.

Warden, GDCP, 650 F. App'x 695, 700 (11th Cir. 2016); Wallace, 229 F. App'x at 830 (noting

the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in

avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves

'in relation to the ordinary incidents of prison life.'" (quoting Wilkinson v. Austin, 545 U.S.

209,223 (2005))).  "Confinement to administrative segregation, under conditions substantially

similar to those experienced by the general population of the prison," however, "does not

implicate liberty interests . . . ."  Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006).

Thus, courts must determine whether the conditions in segregated confinement present such a

dramatic unfavorable departure from the basic conditions of an inmate's sentence, that an inmate

has an independent liberty interest in their avoidance.  Wilkerson, 545 U.S. at 223–24 (citing

Sandin, 515 U.S. at 485).

Plaintiff alleges several ways in which the conditions in segregated confinement present

particularly atypical and significant hardships.[14]  Plaintiff alleges inmates in segregated

confinement are housed in closet-sized cells, which they share with another inmate.  Id. at 10.

The cell toilet is filled with stagnant waste "a majority of the time," as it can only be flushed

from the outside.  Id.  Plaintiff says those in Tier II are allowed out of their cells only one hour a

day but typically do not receive that time out due to frequent lockdowns.  Id.  Plaintiff states

these conditions afford little to no human contact.  Id.  He alleges he did not receive his

medically prescribed diet and that the food portions he did receive were inadequate, causing him

---

[14]     Plaintiff's original complaint included relatively threadbare allegations about the distinctions
between Tier II and general population.  After considering those allegations, I recommended the Court
dismiss Plaintiff's procedural due process claim, concluding that Plaintiff failed to allege facts showing
that Tier II assignment imposed an "atypical and significant hardship."  Doc. 37 at 20–21.  However,
Plaintiff's Second Amended Complaint contains substantially more detailed allegations.  Accordingly, I
vacate my previous Report and Recommendation and consider Plaintiff's more detailed allegations.

to lose weight for nearly two years.  Id. at 2, 4–5.  Plaintiff also describes the use of MK-90 riot

spray in the segregated confinement units.  Id. at 6–13.  According to Plaintiff, MK-90 is

intended "for riots only," but prison officials frequently deployed the spray in Tier II in less

extreme circumstances.  Id.  When sprayed, the gas would cover the whole dormitory, and all

inmates "housed in cells" would "have to cover their mouths with their towels and wet

washcloths in order to breathe."  Id.  Plaintiff is asthmatic, and use of the spray would trigger

asthma attacks, causing him to choke and experience difficulty breathing.[15]  Id.  Prison officials

did not provide Plaintiff with medical attention after deploying the gas but only treated "the ones

who are directly sprayed."  Id.  Finally, Plaintiff's placement in segregated confinement

disqualified him from being able to transfer to a transition center and ultimately be released on

parole.  Id. at 10.

Crucial to the Court's analysis of Plaintiff's claims is the Rule 12(b)(6) posture.  In this

posture, the Court must accept the facts of Plaintiff's Complaint as true and make all reasonable

inferences in his favor.  Magluta, 375 F.3d at 1273.  In doing so, the Court must infer, and then

analyze, that for a period of almost two years, Plaintiff did not receive his medically prescribed

diet or even adequate nutrition; was frequently exposed to riot spray which aggravated his

asthma; was confined to a closet-sized cell; his cell was not sanitary and he was frequently

exposed to human waste; he was in lockdown for a majority of the time; had little to no human

contact; and was rendered ineligible for parole.  Doc. 41 at 2–13.  In its analysis of Plaintiff's

claims, the Court should also look at both the severity of the hardships and the period of time

---

[15]     Plaintiff alleges that, if he did not have something to cover his mouth during the times the MK-90
riot spray was deployed, he may have died.  Id.

these hardships were suffered.  DelGiudice, 679 F. App'x at 947 (citing Magluta, 375 F.3d at 1282).

In assessing the severity of the hardships, the Court will first take up denial of parole consideration as a factor contributing to atypical and significant hardship.  As explained above, the Georgia parole system does not create a legitimate expectation of parole, and, therefore, does not establish a liberty interest on its own.  35 F.3d at 1503 (en banc); see also Roller v. Mills, No. 19-13091, 2020 U.S. App. LEXIS 542, at *3 (11th Cir. Jan. 8, 2020) (affirming that Georgia's parole system does not confer a protected liberty interest).  Because the denial of parole consideration does not—on its own—implicate a liberty interest, it should be given little to no weight in the "atypical and significant hardship" analysis.

Regarding Plaintiff's other alleged hardships, the Eleventh Circuit has weighed conditions of confinement similar to those in the instant case.  In Magluta, the Eleventh Circuit found that conditions of confinement can amount to an atypical and significant hardship when a prisoner alleges that he was in solitary confinement, locked in an extremely small, closet-sized space, with minimal contact with other human beings for a prolonged time exceeding 500 days. 375 F.3d at 1282.  In light of Magluta, Plaintiff has alleged facts that could plausibly demonstrate that Tier II segregation imposed an atypical and significant hardship relative to ordinary prison life.[16]

---

[16]    In DelGiudice v. Primus, 679 F. App'x 944, 948 (11th Cir. 2017), the court considered a procedural due process claim similar to the one asserted by Plaintiff in this case.  The court initially concluded that the plaintiff's allegation that he was in segregation for a long period of time was not enough, on its own, to demonstrate an atypical and significant hardship.  However, the court also noted the plaintiff alleged (albeit in response to a motion to dismiss) the following: he was in segregation for three years; the cells were very small; he was limited to recreation two times a week, showers three times a week, a phone call once a month, and cell cleaning once a week; he was prohibited from attending religious or educational programs and from associating with other prisoners; he was deprived of an adequate law library and legal books; and his placement adversely affected his parole eligibility.  Id.  The

The severity of the conditions does not alone establish a liberty interest.  Generally, atypical and significant hardships must exist for a significant period of time.  Compare Sandin, 515 U.S. at 486 (30 days of administrative confinement was not an atypical and significant hardship), and Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998) (60 days of administrative confinement was not an atypical and significant hardship), with Magluta, 375 F.3d at 1282 (500 days of solitary confinement was sufficient), and Williams v. Fountain, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (one year of solitary confinement was sufficient).  The conditions alleged by Plaintiff, we must infer, continued for approximately two years.  Doc. 41 at 2–13.

Looking at both the severity of the hardships and the duration, Plaintiff has stated a plausible claim for a violation of his procedural due process rights.  In making this determination, I note the atypical and significant hardship inquiry is fact intensive.  Whittsett v. Cannon, 139 F. Supp. 3d 1293, 1302 (M.D. Fla. 2015).  Indeed, much of the Eleventh Circuit and Supreme Court authorities determining the existence of state-created liberty interests compare such evidence on summary judgment or at trial, rather than at the pleading stage, as in the instant case.  See Sandin, 515 U.S. 472; Wilkinson, 545 U.S. 209; Wolff v. McDonnell, 418 U.S. 539 (1974); Bass, 170 F.3d 1312; Rodgers, 142 F.3d 1252; Al-Amin, 165 F. App'x 733.  By contrast, courts are generally less willing to dismiss claims for failure to allege a state-created liberty interest at the motion to dismiss stage of the proceedings.  See Spaulding v. Woodall, 551

court assumed, for the sake of argument, that these allegations stated an atypical and significant hardship relative to general population, but, ultimately, affirmed the trial court's dismissal of the claim because plaintiff was afforded the minimum requirements of due process in his segregation assignment.  The court's characterization of the combination of conditions in DelGiudice supports the view that the conditions described by Plaintiff in this case constitute an atypical and significant hardship.

F. App'x 984 (11th Cir. 2014); <u>Wallace</u>, 229 F. App'x at 830; <u>Magluta</u>, 375 F.3d at 1282–83.

Accordingly, I **RECOMMEND** the Court **DENY** this portion of Defendants' Motions.

## III.    Qualified Immunity

Defendants argue Plaintiff's Complaint should be dismissed because the defense of qualified immunity bars recovery in this action.  Doc. 21-1 at 20.  Specifically, Defendants argue they are entitled to dismissal of Plaintiff's procedural due process claim because Plaintiff fails to make allegations that would demonstrate an atypical and significant hardship relative to ordinary prison life (i.e., Defendants reiterate their failure-to-state-a-claim argument) and because there is no clearly established law showing that the conditions of Tier II constitute an atypical and significant hardship.  <u>Id.</u> at 22.

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>see also</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1193–94 (11th Cir. 2002).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . ."  <u>Lee</u>, 284 F.3d at 1194.

This defense "reflects an effort to balance 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  <u>Jones v. Fransen</u>, 857 F.3d 843, 850–51 (11th Cir. 2017) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).  "The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate 'clearly established federal

statutory or constitutional rights of which a reasonable person would have known.'" Id. at 851

(quoting Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010)).

"As a result, qualified immunity shields from liability 'all but the plainly incompetent or

one who is knowingly violating the federal law.'" Id. (quoting Lee, 284 F.3d at 1194).

However, "the doctrine's protections do not extend to one who 'knew or reasonably should have

known that the action he took within his sphere of official responsibility would violate the

constitutional rights of the [plaintiff].'" Id. (quoting Harlow, 457 U.S. at 815 (internal quotation

marks and alteration omitted)). Additionally, "[b]ecause qualified immunity is only a defense to

personal liability for monetary awards resulting from government officials performing

discretionary functions, qualified immunity may not be effectively asserted as a defense to a

claim for declaratory or injunctive relief." Ratliff v. DeKalb County, 62 F.3d 338, 340 n.4 (11th

Cir. 1995).

To receive qualified immunity, government officials must first establish that they were

acting within their discretionary authority during the events in question. Maddox v. Stephens,

727 F.3d 1109, 1120 (11th Cir. 2013). Discretionary authority includes all actions of a

governmental official that "(1) were undertaken pursuant to the performance of his duties, and

(2) were within the scope of his authority." Dang ex rel. Dang v. Sheriff, Seminole County, 871

F.3d 1272, 1279 (11th Cir. 2017) (citing Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)).

Here, Plaintiff does not contest Defendants were acting within their respective

discretionary authorities. Indeed, Defendants, while on duty as prison officials, assigned

Plaintiff to Tier II and kept him there pursuant to a process that Plaintiff alleges denied him an

opportunity to be heard. Doc. 41 at 2, 4.

Once a defendant establishes that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Dang, 871 F.3d at 1279. To make this showing, a plaintiff "must first prove that the facts alleged, construed in the light most favorable to it, establish that a constitutional violation did occur." Shaw v. Selma, 884 F.3d 1093, 1099 (11th Cir. 2018) (citing Smith v. LePage, 834 F.3d 1285, 1291 (11th Cir. 2016)). At this stage in the litigation, Plaintiff has plausibly alleged Defendants committed a clear violation of his rights under the Fourteenth Amendment.

Having alleged a constitutional violation, Plaintiff must show "that law existing at the time . . . clearly established that the conduct violated the constitution." Selma, 884 F.3d at 1099 (citing Pearson v. Callahan, 555 U.S. 223, 232–36 (2009)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001); Wilson v. Layne, 526 U.S. 603, 615 (1999). To determine "whether the law clearly established the relevant conduct as a constitutional violation at the time that [d]efendant [o]fficers engaged in the challenged acts," the defendants must have had "fair warning" that their conduct violated a constitutional right. Fransen, 857 F.3d at 851 (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (citations and internal quotation marks omitted)). "'Fair warning' comes in the form of binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state . . . that 'make[s] it obvious to all reasonable government actors . . . that what he is doing violates a federal law.'" Id. (alteration in original) (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted)).

While a plaintiff need not supply "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond

debate." White v. Pauly, 137 S. Ct. 548, 551 (2017).  Notably, "officials can still be on notice

that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer,

536 U.S. 730, 741 (2002); see also Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994)

("The 'very action in question' does not have to have been previously held unlawful, but the

unlawfulness of the conduct must be apparent in light of pre-existing law.") (citing Anderson v.

Creighton, 483 U.S. 635, 640 (1987)).  In light of this, there are three ways a plaintiff may

demonstrate that a defendant had "fair warning" that a right is clearly established: "(1) case law

with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of

principle within the Constitution, statute, or case law that clearly establishes a constitutional

right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total

absence of case law."  Maddox, 727 F.3d at 1121 (quoting Lewis v. City of West Palm Beach,

561 F.3d 1288, 1291 (11th Cir. 2009)); Fransen, 857 F.3d at 852.

     "Some broad statements of principle in case law are not tied to particularized facts and

can clearly establish law applicable in the future to different sets of detailed facts."  Terrell v.

Smith, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1351

(11th Cir. 2002)); cf. Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) ("Of course, general

statements of the law are not inherently incapable of giving fair and clear warning to officers.")

(quoting White, 137 S. Ct. at 552).  However, "the principle must be established with 'obvious

clarity' by the case law so that 'every objectively reasonable government official facing the

circumstances would know that the official's conduct did violate federal law when the official

acted.'"  Terrell, 668 F.3d at 1256 (citing Vinyard, 311 F.3d at 1351); Fransen, 857 F.3d at 852.

Importantly, the "reasoning, though not the holding of prior cases can also send the same

message to reasonable officers in novel factual situations." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citation and internal quotation marks omitted).

Defendants assert Plaintiff failed to allege a constitutional violation, and, to the extent he does, Plaintiff has failed to show there was any clearly established law that would have put Defendants on notice. Doc. 21-1 at 21. Defendants' first argument fails because, as explained above, I have concluded that Plaintiff has stated a plausible claim that Defendants violated his right to procedural due process. I also reject Defendants' second argument—that the law was not clearly established so as to provide notice. Sandin and its progeny have clearly established, when the conditions of segregated confinement impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," a due process protected liberty interest is established. 515 U.S. at 484. At a minimum, the process owed requires notice, an opportunity to be heard, and periodic review. Hewitt v. Helms, 459 U.S. 460, 476 (1983); O'Connor v. Fla. Dep't of Corr., 379 F. App'x 946, 947 (11th Cir. 2010) ) (citing Sheley v. Dugger, 833 F.2d 1420, 1426 (11th Cir. 1987)); Hale v. Sec'y for the Dep't of Corr., 345 F. App'x 489, 493 (11th Cir. 2009). The principle espoused in Sandin controls the particular facts of Plaintiff's case: it would be plainly obvious to any reasonable officer that Plaintiff's prolonged confinement in Tier II creates a significant hardship as compared to confinement in general population such that denying Plaintiff meaningful and periodic opportunity to be heard violates the Constitution. Plaintiff is constitutionally guaranteed a modicum of due process protection while in Tier II administrative segregation, and Defendants' alleged denial of his right to be heard would violate clearly established law.

To be clear, I do not conclude Defendants did, in fact, violate Plaintiff's due process rights. Accepting Plaintiff's factual allegations as true, as I must, Plaintiff's Tier II assignment

imposed atypical and significant hardships relative to ordinary prison life such that Plaintiff had

a liberty interest in their avoidance, and Defendants denied him the process due for a deprivation

of that liberty.  Plaintiff's alleged conditions of confinement coupled with Plaintiff's allegations

regarding his assignment and review were—in the light of the preexisting law—beyond what the

Constitution would allow.  Consequently, because Plaintiff has set forth a plausible violation of

his clearly established rights under the Fourteenth Amendment, the Court should **DENY** this

portion of Defendants' Motions.

**IV.    Damages**

Defendants argue the PLRA limits Plaintiff's recovery to nominal damages.  Doc. 21-1 at

23.  They assert that 42 U.S.C. §1997e(e) of the PLRA bars damages recovery for mental or

emotional injury where these is no connected physical injury.  Id.  Defendants maintain the

majority of Plaintiff's alleged injuries are mental or emotional, and any physical injury Plaintiff

suffered is *de minimis*, and therefore, insufficient to meet the physical injury requirement of the

PLRA.  Id.

Section 1997e(e) does apply to Plaintiff's claim, and he must show he suffered a

sufficient physical injury to recover compensatory and punitive damages.  Not just any allegation

of physical injury is sufficient, for "such an interpretation would undermine the statute's

essential purpose—'to curtail frivolous and abusive prisoner litigation.'"  Harris v. Garner, 190

F.3d 1279, 1286 (11th Cir. 1999) ("Harris I"), *reh'g en banc granted and opinion vacated*, 197

F.3d 1059 (11th Cir. 1999), *opinion reinstated in relevant part by* Harris II, 216 F.3d 970 (11th

Cir. 2000).  Rather, "the physical injury must be more than *de minimis*[] but need not be

significant."  Id.  Plaintiff has alleged that the use of riot spray in the Tier II dorms would trigger

asthma attacks, causing him to choke and experience difficulty breathing.  Doc. 41 at 6–13.

Injuries caused by pepper spray or other chemical irritants are not categorically *de minimis* for the purposes of §1997e(e).  Thompson v. Smith, No. 18-11671, 2018 WL 1189387, at *6–10 (11th Cir. Mar. 12, 2020) (finding that, although the injuries from pepper spray may be temporary and perhaps non-substantial, they are not categorically *de minimis* such that a plaintiff is barred from recovering compensatory or punitive damages).  Plaintiff also alleges he was denied a medically required diet and even adequate food portions for a period of nearly two years.  Doc. 41 at 2.  He states these inadequate portions caused him hunger, weight loss, pain, and suffering.  Id. at 2, 5, 12.  Physical injury from inadequate food is not categorically *de minimis*.  Merilen v. Granison, No. 3:18-cv-56, 2019 WL 2499186, at *14 (S.D. Ga. Feb. 13, 2019) (determining that physical injuries from a lack of food are not categorically *de minimis*).  Taking Plaintiff's allegations together, I find that Plaintiff has plausibly alleged more than *de minimis* injuries, and he should not be precluded—as a matter of law—from recovering compensatory or punitive damages at this time.  Thus, I **RECOMMEND** the Court **DENY** this portion of Defendants' Motions.  However, to be clear, I do not conclude that Plaintiff has established more than *de minimis* injuries; rather, I conclude only for the purposes of pleading a plausible claim, Plaintiff has adequately alleged more than *de minimis* injuries.

## CONCLUSION

For the reasons set forth above, I **GRANT** Plaintiff leave to amend his Complaint.  I **VACATE** the March 12, 2019 Report and Recommendation and enter the following in its stead.  Doc. 37.  I **RECOMMEND** the Court **GRANT in part** Defendants' Motions to Dismiss, docs. 21, 48, and **DISMISS** Plaintiff's excessive force, failure to intervene, and retaliation claims for lack of proper exhaustion.  I **RECOMMEND** the Court **DENY in part** Defendants' Motions to Dismiss, docs. 21, 48, as the Motions relate to Plaintiff's procedural due process claim,

Defendants' qualified immunity defense, and Defendants' damages limitation argument.
Further, the Court **GRANTS** Plaintiff's Motions to Join Documents and Motion to Receive
Information.  Docs. 51, 53.  Finally, the Court **DENIES as moot** Plaintiff's Motion to Receive
Information.  Doc. 55.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to
file specific written objections within 14 days of the date on which this Report and
Recommendation is entered.  Any objections asserting that the Magistrate Judge failed to address
any contention raised in the Complaint must also be included.  Failure to do so will bar any later
challenge or review of the factual findings or legal conclusions of the Magistrate Judge.  See 28
U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).  A copy of the objections must be
served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United
States District Judge will make a de novo determination of those portions of the report, proposed
findings, or recommendation to which objection is made and may accept, reject, or modify in
whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not
meeting the specificity requirement set out above will not be considered by a District Judge.  A
party may not appeal a Magistrate Judge's report and recommendation directly to the United
States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final
judgment entered by or at the direction of a District Judge.

The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 1st day of May, 2020.


BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA