IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | |
|---|---|
| RASHARD CHARLES CONNER, | |
| Plaintiff, | CIVIL ACTION NO.: 6:17-cv-10 |
| v. | |
| MARTY ALLEN, et al., | |
| Defendants. | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on unopposed Defendants' Motion for Summary Judgment. Doc. 73. The Clerk of Court mailed a Notice to Plaintiff advising him Defendants filed a Motion for Summary Judgment and that a response must be filed by February 11, 2021. Doc. 74. The Court's Notice further advised Plaintiff:

1.  If you do not timely respond to this motion . . ., the consequence may be the Court will deem the motion unopposed, and the Court may enter judgment against you;

2.  If your opponent's Statement of Material Facts sets forth facts supported by evidence, the Court may assume you admit all such facts unless you oppose those facts with your own Statement of Material Facts which also sets forth facts supported by evidence; and

3.  If a summary judgment motion is properly supported, you may not rest on the allegations in you [Complaint] alone.

Id. This Notice was not returned to the Clerk of Court as undeliverable to Plaintiff. Plaintiff has not filed a response, and the time to do so has expired.

However, "the district court cannot base the entry of summary judgment on the mere fact that the motion [is] unopposed but, rather, must consider the merits of the motion." United

States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (citation omitted).  Specifically, the court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).

The time for Plaintiff to file a response has elapsed, and Defendants' Motion is now ripe for adjudication.  For the following reasons, I **RECOMMEND** the Court **GRANT** Defendants' unopposed Motion for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

## BACKGROUND

Plaintiff brought this 42 U.S.C. § 1983 action relating to his conditions of confinement in Tier II at Georgia State Prison ("GSP").  Doc. 1.  Because Plaintiff's initial Complaint was unclear, the Court ordered Plaintiff to submit an Amended Complaint.  Doc. 7.  After conducting frivolity review, the Court found Plaintiff stated the following plausible claims: Eighth Amendment excessive force and failure to intervene claims against Defendant Herndon; First Amendment retaliation claims against Defendants Jackson, Hutcheson, Allen, and Toole; and Fourteenth Amendment procedural due process claims against Defendants Jackson, Hutcheson, Allen, and Toole.  Doc. 9.  The Court dismissed Plaintiff's official capacity claims against all Defendants and Plaintiff's access to courts and substantive due process claims.  Id.

Plaintiff submitted an Amended Complaint as directed.  Doc. 8.  Defendants then filed a motion to dismiss.  Doc. 21.  The undersigned originally recommended granting Defendants' motion to dismiss and dismissing Plaintiff's Amended Complaint in its entirety.  Doc. 37.  However, the undersigned vacated the original Report and Recommendation and granted the motion to dismiss only in part after Plaintiff filed various motions and objections.  Doc. 57.  In

the second Report and Recommendation, the undersigned treated all of Plaintiff's previous filings collectively as Plaintiff's Second Amended Complaint. Doc. 57 at 2 (citing Docs. 1, 8, 41). The Court dismissed Plaintiff's claims for excessive force, failure to intervene, and retaliation claims due to Plaintiff's failure to exhaust administrative remedies. Doc. 57. Thus, the only remaining claim is a procedural due process claim asserted against Defendants Jackson, Hutcheson, Allen, and Toole.

## UNDISPUTED MATERIAL FACTS[1]

At all times relevant to this lawsuit, Defendant Marty Allen was the Warden of GSP, Defendant Joseph Hutcheson was the Unit Manager for the Tier II dorm, Defendant Valarie Jackson was the Deputy Warden of the Tier I dorm, and Defendant Robert Toole was the Director of Field Operations. Doc. 73-2 at 1. Plaintiff Rashard Charles Conner has been incarcerated by the Georgia Department of Corrections ("GDC") since 2007 after he was convicted of robbery in 2007 and armed robbery in 2009. Id. at 1–2. Since August 6, 2012, and at all times relevant to this lawsuit, Plaintiff was housed at GSP. Id. at 2. Before arriving at GSP, Plaintiff was housed at Ware State Prison where he got into a physical fight with a group of inmates. Id. As a result of that fight, Plaintiff was assigned to the Tier II program, which is why he was initially housed at GSP since there was no Tier II program at Ware State Prison. Id. Plaintiff went through the Tier II program in 2014 and never filed a lawsuit complaining about the conditions of the program. Id. After Plaintiff was released from the Tier II program in 2015, he received a number of disciplinary reports against him, accusing him of violating prison rules,

---

[1] The recited facts represent the facts in the record and draw all reasonable inferences in the light most favorable to Plaintiff, the non-moving party. See Peppers v. Cobb Cnty., 835 F.3d 1289, 1295 (11th Cir. 2016). Plaintiff has not filed any response to Defendants' Motion for Summary Judgment. Thus, all facts set forth by Defendants are undisputed. See Local R. 26.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.").

3

and was found guilty of those disciplinary reports.  Id.  Plaintiff had a background of receiving disciplinary reports from Ware State Prison and Telfair State Prison and prior experience going through the Tier II program at GSP.  Id.  He was a closed security classification (the highest), and he received additional disciplinary reports after leaving to the Tier II program in 2015, leading up to his assignment to the Tier II program, once again, in August 2016.  Id.  From April 4, 2016 through September 12, 2016 alone, Plaintiff received disciplinary report Numbers 64993, 31745, 35045, and 65516 and was found guilty of all four of those disciplinary reports.  Id.

**I.      Plaintiff's 2016 Assignment to Tier II**

On September 30, 2016, while living in general population, Plaintiff got into a fight with his assigned roommate outside the chow hall.  Id. at 3.  Correctional Emergency Response Team ("CERT") officers arrived, broke up the fight, handcuffed both Plaintiff and his roommate, and escorted both to the medical office.  Id.  After he was seen by medical personnel, Plaintiff was written a disciplinary report for his part in the fight and assigned to administrative segregation, or Tier I, pending an investigation into the fight.  Id.  Plaintiff makes no complaints about his initial assignment to the Tier I program pending an investigation of his role in the September 30 fight. Id.  After the investigation into the fight, Plaintiff was found not guilty and the disciplinary report he had received for the fight was expunged from his records by Defendant Allen.  Id.

After his disciplinary report from the fight was expunged, instead of going back to general population, Plaintiff was assigned to the Tier II program.  Id.  On October 28, 2016, Plaintiff was assigned to the Tier II program because he had received six disciplinary reports within the past year, charging him with, among other violations, failure to follow instructions, injury to other inmate or himself, and exposing himself to prison staff.  Id.  He was also assigned to Tier II because of his high security classification and his previous involvement in a fight.  Id.

4

at 3–4.  Plaintiff appealed his assignment to Tier II, arguing the disciplinary report he received for the September 30, 2016 fight had been expunged from his records.  Id. at 4.  However, his appeal was denied since his assignment was based on his disciplinary history and not just the one fight.  Id.

## II.     The Tier II Program

The GDC uses the Tier Segregation Program to provide a managed stratification-oriented, incentive-based pathway for certain offenders to successfully transition from segregation to lower levels of security as they demonstrate appropriate behavior and program compliance.  Id.  The Tier Program's purpose is to protect staff, offenders, and the public from offenders who commit certain actions or who otherwise pose a serious threat to the safety and security of the prison.  Id.  The Tier Segregation Program is divided into three sub-programs—Tier I, Tier II, and Tier III.  Id.  Tier I is the least restrictive program, while Tier II is somewhat restrictive, and Tier III (or the Special Management Unit ("SMU")) is the most restrictive.  Id.

The Tier II Program is governed by Standard Operating Procedure ("SOP") Policy Number 209.08, which outlines the basis for assignment to the program and the conditions of the program.  Id.  Placement in Tier II is the result of a Classification Committee's decision that is approved by the Warden.  Id. at 5.  To be eligible for placement in Tier II, an offender must have met one of several criteria, which include being noted as a threat to the safe and secure operation of the facility.  Id.  This may also include, but is not limited to, offenders who have demonstrated security threat group or gang involvement, notoriety of crimes, high level of supervision requirement, and offenders who have either been threatened with bodily harm or threatened others with bodily harm.  Id.  Three or more disciplinary charges within the previous 12 months that involve assaultive or excessive disruptive behavior would also make an inmate eligible for

Tier II classification.  Id.  Further, offenders with assaultive histories are also eligible.  Id.  Inmates can appeal the Classification Committee's decision to the Warden and then to the Director of Field Operations.  Id.

The Tier II Program has three phases—Phase 1, Phase 2, and Phase 3.  Id.  Movement between the phases is based on the inmate's behavior and the inmate has to complete all three phases to be eligible for new housing assignment, up to and including a return to general population.  Id.  Inmates' assignment to Tier II are reviewed every 90 days by the Classification Committee, which then decides whether to move the inmate through to the next phase of the program, keep him at the same phase, or send him back to a lower phase.  Id.  As inmates progress from Phase 1 (the first phase) through the program, they are rewarded with more and more privileges.  Id.

### III.     The Conditions and Privileges of the Tier II Program

Inmates assigned to the Tier II Program have, at a minimum, a number of privileges, which include but are not limited to the following: (1) the opportunity for personal hygiene three times per week; (2) food in the same quality and quantity as that provided to inmates in general population; (3) five hours of exercise per week; (4) telephone privileges in accordance with limitations outlined in Phase assignments; and (5) visitation privileges in accordance with limitations outlined in Phase assignments.  Id.  The Tier II SOP outlines the privileges to which inmates in each phase of the program are entitled.  Id.  For example, inmates are allowed up to $15.00 per week to spend in the prison's commissary in Phases 1 and 2 and $30.00 per week in Phase 3.  Id.  In general population, inmates are allowed up to $60.00 per week.  Id.  While Plaintiff had commissary privileges, he had no money on his books to get anything from the prison's commissary.  Id.

6

While in Tier II, Plaintiff received at least three meals containing 2,800 calories daily. Id. Plaintiff also had a cellmate and received regular showers. Id. Plaintiff was allowed to make phone calls to family and friends. Id. However, Plaintiff did not do so because the prison had a new phone system and he could not recall their phone numbers. Id. at 7. Plaintiff was allowed to request reading material from the library and also had regular outdoors recreational time. Id. The flush button for the toilet in each cell was located on the outside of the cell. Id. This is because Tier II inmates have a history of flooding their cells and causing extensive damage to the prison when they were able to flush toilets themselves. Id. The Tier II dorm at GSP was staffed with two officers at all times. Id. One officer was stationed in the control booth, and the other patrolled the floor of the dorm checking in on inmate at least once every 30 minutes. Id. The floor officer was tasked with flushing inmates' toilets when necessary, and inmates could get the floor officer's attention at any time within the 30 minutes by calling out for said officer. Id. While in Tier II, Plaintiff never filed a grievance complaining about his toilet being unflushed or receiving insufficient food. Id.

**IV.     Process Plaintiff Received While in Tier II**

After Plaintiff was assigned to Tier II and his appeal of his initial assignment was rejected, Plaintiff received his first 90-day review on January 31, 2017. Id. During that review, Plaintiff was promoted from Phase 1 of Tier II to Phase 2 due to his positive behavior. Id. at 7–8. Plaintiff received his next 90-day review on May 8, 2017. Id. at 8. After that review, he was assigned to Phase 3 of Tier II due his positive behavior. Id. On August 9, 2017, Plaintiff received his next 90-day review. Id. During that review, Plaintiff was reassigned to Phase 1 of Tier II due to his negative behavior. Id. Specifically, Plaintiff refused to secure the tray flap on his cell door on July 13, 2017, and he was observed masturbating during pill call on July 30,

7

2017.  Id.  Plaintiff appealed his reassignment to Phase 1 and denied both disciplinary infractions.  Id.  However, on August 11, 2017, the Warden approved Plaintiff's reassignment.  Id.  On October 25, 2017, Plaintiff received his 90-day review and was promoted from Phase 1 to Phase 2 of Tier II based on his positive behavior.  Id.  Then, on January 19, 2018, Plaintiff received his next 90-day review and was assigned to Phase 3 of Tier II based on his positive behavior.  Id.  After completing Phase 3 of Tier II, Plaintiff was phased out of Tier II and eventually returned to general population.  Id.

## DISCUSSION

Plaintiff's procedural due process claim surrounds his placement in Tier II administrative segregation.  Doc. 8 at 7.  Plaintiff contends he was wrongfully placed in Tier II after receiving a disciplinary report related to a fight in which he was involved.  Doc. 8 at 6.  Plaintiff alleges he was wrongfully held in Tier II for two years as a form of punishment without due process even after this disciplinary report was expunged.  Doc. 8 at 6.  Plaintiff contends he was denied 90-day reviews at various points.  Doc. 41 at 1–2, 8–10.  Overall, Plaintiff alleges: (1) his assignment to Tier II prevented his ability to obtain parole; and (2) the conditions of Tier II impose a significant hardship in relation to general population.  Doc. 57 at 19.

### I.     Legal Standard

Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process."  Quintanilla v. Bryson, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)).  Relating to the first factor, "[d]etermining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word."

Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999); see also Jacoby v. Baldwin Cnty., 835 F.3d 1338, 1346 (11th Cir. 2016) (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999)). In Sandin v. Conner, the United States Supreme Court held courts should examine the conditions of confinement rather than state law or prison's grievance policies to determine whether a liberty interest exists. 515 U.S. 472, 483–85 (1995).

The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required. Kirby, 195 F.3d at 1290–91. First, there is a protected due process liberty interest "when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court." Id.; Sandin, 515 U.S. at 484. Second, a state-created liberty interest may arise "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Kirby, 195 F.3d at 1291 (quoting Sandin, 515 U.S. at 484); see also Smith v. Deemer, 641 F. App'x 865, 868 (11th Cir. 2016) ("Atypical and significant hardships must also be severe relative to regular prison."); Jacoby, 835 F.3d at 1346–47 ("This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life.").

Thus, a state-created liberty interest in avoiding segregated confinement may exist where the conditions of the segregated confinement constitute an "atypical and significant hardship on the inmate. . . ." as compared to the general population. Quintanilla, 730 F. App'x at 743 (quoting Sandin, 515 U.S. at 484 ); Turner v. Warden, GDCP, 650 F. App'x 695, 700 (11th Cir. 2016); Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007) (noting the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive

9

conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" (quoting Wilkinson v. Austin, 545 U.S. 209, 223 (2005))). "Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison," however, "does not implicate liberty interests . . . ." Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006). Therefore, courts must determine whether the conditions the plaintiff experienced in segregated confinement present such a dramatic unfavorable departure from the basic conditions of an inmate's sentence that the plaintiff has an independent liberty interest in their avoidance. Wilkinson, 545 U.S. at 223–24 (citing Sandin, 515 U.S. at 485).

In assessing the severity of the hardships faced by inmates in segregated confinement, the Court looks first to the seminal Supreme Court case Wilkinson v. Austin, 545 U.S. 209 (2005). In Wilkinson, the Court held prisoners had a liberty interest in avoiding confinement in a "Supermax" prison because the conditions there constituted an atypical and significant hardship. Id. at 224. Specifically, almost all human contact was prohibited, including conversation between cells; a light in the cell was on for 24 hours per day; exercise was only allowed in a small indoor room; confinement was indefinite and was only reviewed annually; and placement in the Supermax facility disqualified otherwise eligible inmates from parole consideration. Id. at 223–24. The Supreme Court explained that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." Id. at 224.

The Eleventh Circuit considered a similar issue in Turner v. Warden, GDCP, 650 F. App'x 695 (11th Cir. 2016). In Turner, a prisoner-plaintiff asserted a procedural due process

10

claim concerning his assignment to Georgia State Prison's SMU (special management unit).[2] The court concluded the SMU conditions were similar to those in the general population, noting the following SMU conditions:

> Plaintiff regularly received meals and five hours of outdoor recreation time each week. He was allowed to shower three times per week. Unless he was in the most restrictive wing, he was allowed to have his personal property and in some wings even had a television in his cell. Plaintiff was not denied human contact and even received visitation on the weekends.

Id. at 700. The court held there was "no combination of facts demonstrating that [plaintiff's] incarceration in the SMU (special management unit) imposed an atypical and significant hardship compared to ordinary prison." Id. at 701. As a result, the court held the plaintiff had no state-created liberty interest in avoiding confinement in the SMU and affirmed the trial court's grant of summary judgment to defendant on the claim. Id.

In another Eleventh Circuit opinion, the court discussed conditions of confinement in another Georgia prison's SMU and assumed, for the sake of argument, the conditions imposed an atypical and significant hardship. DelGiudice v. Primus, 679 F. App'x 944, 948 (11th Cir. 2017). There, the plaintiff alleged, in response to a motion to dismiss, the following:

> [H]e had been in SMU for over three years; the SMU cells were 60 square feet; he was limited to recreation two times a week, showers three times a week, a phone call once a month, and cell cleaning once a week; he was prohibited from attending religious or educational programs, and from associating with other prisoners; and he was deprived of an adequate law library and legal books.

Id. The DelGiudice court assumed, without deciding, the allegations stated an atypical and significant hardship relative to general population, but, ultimately, affirmed the trial court's dismissal of the claim because plaintiff was afforded the minimum requirements of due process

---

[2] Notably, the SMU (known as Tier III) is the most restrictive level of incarceration in the Georgia prison system. Doc. 73-2 at 4.

in his segregation assignment.[3]  Id.

**II.    Analysis**

The threshold issue to resolving Defendants' Motion for Summary Judgment is whether Plaintiff held a liberty interest in avoiding assignment to and continued confinement in Tier II at GSP.  If Plaintiff did not possess such a liberty interest, there is no need to assess the adequacy of the procedures used to place and maintain Plaintiff on Tier II because no specific process was constitutionally required.  See Wilkinson, 545 U.S. at 221.  Based on the undisputed facts, Plaintiff cannot show he held a liberty interest in avoiding assignment to Tier II.  Plaintiff did not file a response to Defendants' Motion for Summary Judgment, and, thus, Plaintiff has produced no evidence showing he faced an atypical and significant hardship.  Quintanilla, 730 F. App'x at 743.

As a preliminary matter, Plaintiff's ability to obtain parole plays no role in this analysis, as this Court explained previously.  Doc. 57 at 23.  The Eleventh Circuit has held "the Georgia parole system does not create a liberty interest protected by the Due Process Clause, since 'the substantial discretion reserved by the Georgia Board of Pardons and Parole belies any claim to a reasonable expectation of parole.'"  DelGiudice, 679 F. App'x at 947–48 (quoting Sultenfuss v. Snow, 35 F.3d 1494, 1499 (11th Cir. 1994)); see also Bankhead v. Ga. State Bd. of Pardons & Paroles, 197 F. App'x 816, 817 (11th Cir. 2006); Sultenfuss, 35 F.3d at 1497–1503.

Considering the Eleventh Circuit's previous decisions, the undisputed evidence in this case demonstrates the conditions of Tier II at GSP, as experienced by Plaintiff, were not atypical

---

[3]    It is worth noting the three years of segregation impacted the Court's atypical and significant hardship analysis.  679 F. App'x at 948.  Indeed, the Eleventh Circuit notes "[b]oth the period of time and the severity of the hardships must be taken into consideration.  Id. at 947 (citing Magluta v. Samples, 375 F.3d 1269, 1282 (11th Cir. 2004)); see also Doc. 57 at 27 (discussing the significance of the duration of administrative segregation in assessing whether a hardship is atypical and significant).

and significant relative to the general population conditions. Importantly, Plaintiff was housed in Tier II, which is less restrictive than Tier III (SMU). Doc. 73-2 at 4. The Eleventh Circuit has previously held an inmate does not have a liberty interest in avoiding placement or continued confinement even in the more restrictive SMU. Turner, 650 F. App'x at 700; DelGiudice, 679 F. App'x at 948. It is undisputed Plaintiff, as an inmate assigned to the Tier II Program, received the following: personal hygiene opportunities three times per week including regular showers; similar food to the general population in both quality and quantity; five hours of exercise per week; outdoor recreational time; telephone privileges; and visitation privileges. Doc. 73-2 at 6–7. Plaintiff had a cellmate and could request reading materials from the library. Id. at 7. Although the flush button for toilets was located outside the cell, a floor officer tasked with flushing toilets checked in on inmates every 30 minutes. Id. at 7. Depending on phase placement, Tier II inmates were permitted to use a quarter to half of the commissary funds general population prisoners were permitted.[4] Id. at 6.

A reasonable jury could not find these conditions taken together rise to the level of an atypical and significant hardship compared to the general population. Wilkinson, 545 U.S. at 224. Like the inmate in Turner, Plaintiff was afforded opportunities for human contact, regular meals and hygiene, and outdoor recreation as a Tier II inmate. 650 F. App'x at 700. This Court and other courts have also previously held inmates do not possess a liberty interest in their assignment to Tier II. See, e.g., Lundy v. Bryson, No. 5:16-cv-71, 2020 WL 4810237, at *9

---

[4] Plaintiff raised various other issues in his Complaints regarding the conditions he experienced while on Tier II, including complaints about inadequate nutrition, exposure to riot spray, the size of his cell, and extent of human contact. See Doc. 57 at 25–26 (describing allegations). However, Defendants have come forward in their Motion for Summary Judgment with evidence controverting those allegations, demonstrating Plaintiff received adequate nutrition, any exposure to riot spray was identical to exposure in general population, and he had regular human contact. Doc. 73-1 at 10–11. As noted, Plaintiff has not opposed Defendants' Motion or disputed any of Defendants' factual allegations or supporting evidence.

13

(S.D. Ga. July 28, 2020) (granting summary judgment for defendants relating to Tier II claim at Ware State Prison); Quintanilla v. Bryson, No. 6:17-cv-4, 2020 WL 1441405, at *9 (S.D. Ga. Mar. 20, 2020) (granting summary judgment to defendant where undisputed material facts demonstrated the conditions plaintiff experienced while on Tier II at Georgia's Smith State Prison did not constitute an atypical and significant hardship); Maddox v. Owens, No. 5:15-cv-36, 2018 WL 1513671, at *8 (M.D. Ga. Mar. 27, 2018) ("[T]he Court finds there is no material issue as to whether the conditions Maddox faced in [Tier II at] Macon State Prison, taken together, do not rise to the level of an 'atypical and significant hardship within the correctional context.'").

The conditions Plaintiff experienced, as presented to the Court through the evidence before it, are far less severe than the conditions described in Wilkinson and DelGiudice. Unlike the inmate in Wilkinson, Plaintiff's Tier II assignment was reviewed every 90 days as opposed to yearly. Doc. 73-2 at 7–8. As stated above, Plaintiff was not deprived of human contact like the inmate in Wilkinson because Plaintiff had a cellmate and was permitted visitation and phone calls even though he may not have used these privileges. Id. at 6–7. Unlike the inmate in DelGiudice, Plaintiff was held in Tier II for approximately two years during the disputed time frame as opposed to three. Id. at 7–8. Also unlike the DelGiudice inmate, Plaintiff was not deprived of access to books because he was permitted to request reading materials. Id. at 7. Again, Plaintiff has not produced any evidence tending to show Tier II inmates are treated atypically different compared to the general population. For this reason, Defendants are entitled to summary judgment. Because the Court finds Plaintiff cannot show a liberty interest, the Court declines to address whether Plaintiff was afforded due process and whether Defendants are entitled to qualified immunity.

### III.     Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*. Though Plaintiff has not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal. See Fed. R. App. P. 24(a)(3) (trial court may certify appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when he seeks to advance a frivolous claim or argument. See Coppedge v. United States, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993). An *in forma pauperis* action is frivolous and not brought in good faith if it is "without arguable merit either in law or fact." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's claims and Defendants' Motion for Summary Judgment, there are no non-frivolous issues to raise on appeal, and an appeal on these claims would not be taken in good faith. Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

For the reasons set forth above, I **RECOMMEND** the Court **GRANT** Defendants' unopposed Motion for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date. Objections shall be specific and in writing. Any objection that the Magistrate Judge failed to address a contention raised in the Complaint must be included. Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions. 28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, No. 17-11264, 2020 WL 6039905, at *4 (11th Cir. Oct. 13, 2020). To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections. Harrigan, 2020 WL 6039905, at *4; 11th Cir. R. 3-1. A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 3rd day of March, 2021.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA